IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CONSTANCE R. RAFFERTY,    )<br>    )<br>        Plaintiff,    )<br>    )<br>    )<br>    vs.    )<br>    )<br>KEYPOINT GOVERNMENT    )<br>SOLUTIONS, INC., a Delaware    )<br>corporation; and JOINT TECHNICAL    )<br>SERVICES, LLC, a New Mexico limited    )<br>liability company,    )<br>    )<br>        Defendants.    )<br>    )<br>    ) | Case No: 4:16-cv-00210-DCN<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant KeyPoint Government Solutions, Inc.'s ("KeyPoint") Motion for Summary Judgment (Dkt. 61) and Motion to Strike (Dkt. 72-2); Defendant Joint Technical Services, LLC's ("JTS") Motion for Summary Judgment (Dkt. 64), Motion to Seal (Dkt. 64-6) and Motion for Extension of Time to File *Errata* Declaration (Dkt. 69); and Plaintiff Constance R. Rafferty's Motion to Seal (Dkt. 67) and Motion to Strike (Dkt. 68).[1] The Court heard oral argument on the motions on February 24, 2020, and took the matters under advisement.

---

[1] JTS's Motion to Seal (Dkt. 64-6) was filed as an attachment to its Motion for Summary Judgment. Pursuant to the undersigned Judge's practice standards, KeyPoint filed a separate appendix (Dkt. 72-2) with objections to certain evidence Rafferty included with her Response to KeyPoint's Motion for Summary Judgment. *See* https://id.uscourts.gov/district/judges/nye/Motion_Practice.cfm. For ease of reference, the Court construes KeyPoint's appendix as a Motion to Strike.

For the reasons stated herein, the Court will GRANT KeyPoint's Motion for Summary Judgment; GRANT in PART and DENY in PART KeyPoint's Motion to Strike; GRANT JTS's Motion for Summary Judgment, GRANT in PART and DENY in Part JTS and Rafferty's Motions to Seal, GRANT JTS's Motion for Extension of Time; and DENY Rafferty's Motion to Strike.

## II. BACKGROUND[2]

### A. Factual Background

Rafferty brings various claims arising from her former employment with Defendants JTS and KeyPoint. Rafferty alleges claims for retaliation under federal and state law, tortious interference with prospective economic advantage, and intentional and negligent infliction of emotional distress against JTS. Against KeyPoint, Rafferty alleges claims for discrimination—on the basis of both a perceived and actual disability—in violation of the Americans with Disabilities Act and the Idaho Human Rights Act.

#### 1. Rafferty's employment with JTS

Rafferty was employed as a Program Manager for JTS from March of 2010, until July 10, 2014. During this time, JTS had a contract with the Department of Energy Idaho ("DOE-ID") to process security background checks for the Idaho National Laboratory. In general, JTS submitted clearance investigations for the DOE-ID to the Office of Personal

---

[2] Although the Court would ordinarily confine its recitation of the relevant facts to those that occurred before the suit was filed, here, a number of relevant facts became apparent only after Rafferty received information from the Office of Personal Management through a *Touhy* request, as well as after the Court reopened discovery after a successful Motion to Compel by Rafferty. Because they add context to the parties' arguments and the relevant factual history, the Court includes such facts here, and notes where they are disputed.

Management ("OPM") or to the Federal Bureau of Investigation. When investigations were returned, JTS reviewed them, wrote a case evaluation, and made a recommendation as to whether the individual under investigation should obtain, or maintain, the necessary security clearance.

Rafferty supervised approximately seven JTS employees, including an individual named Kernan Longua. JTS shared an office suite with DOE-ID personnel in the Personal Security Office ("PERSEC") located in Idaho Falls, Idaho. During Rafferty's employment with JTS, the DOE-ID had its own employees at the PERSEC, including an individual named Matt Perkins. Longua and Perkins were friends and interacted frequently.

On February 29, 2012, some of Rafferty's subordinates reported to her that Perkins had made racially offensive statements. Rafferty investigated Perkins and presented her findings and a report to JTS and DOE-ID. Shortly thereafter, Rafferty began being cited, at Perkins' instigation, for minor procedural security issues and other trivial concerns. Rafferty also noticed several whispered conversations between Longua and Perkins. Rafferty was concerned because she had also previously disciplined Longua, and knew he was angry about that action. Further, DOE-ID was JTS's customer, and Rafferty was worried about retaliation.

In October 2013, Rafferty started having health problems, including severe insulin resistance, sleep apnea, and insomnia. Such problems led her to lose sleep and become significantly fatigued. In November 2013, Rafferty was called in by the DOE-ID lead, Ken Gordon, to discuss a complaint Perkins had made regarding Rafferty not coming into work on time. Rafferty informed Gordon of her health conditions and, with Gordon's approval,

discussed her health problems with both Perkins and JTS's employees. Rafferty explained that her condition was causing sleeplessness, grogginess, and other health issues, but that she was working with her doctor to resolve her symptoms.

In January 2014, Rafferty met with her supervisor and Vice President of JTS, Patrick Lashinki, who informed Rafferty that an anonymous complaint letter had been received about her. Lashinki would not allow Rafferty to see the letter, but outlined the allegations contained therein. Rafferty met with Lashinki, Human Resources, and her team members, including Longua, to discuss the letter and rebut its allegations. Rafferty alleges Longua was visibly upset when Rafferty provided evidence to contradict or explain the allegations in the letter. Longua has since admitted he was "98% certain" that he authored the letter. Dkt. 66-11, at 49:14–19.[3] Rafferty subsequently shared more extensively with Lashinki about her health conditions, including insulin resistance, depression, sleep apnea, and other related problems.

In June of 2014, Rafferty underwent a Periodic Review ("PR") of her security clearance. Rafferty passed and her clearance was continued by the DOE-ID office on June 30, 2014. However, on July 3, 2014, Rafferty had an altercation with another DOE-ID employee, Edith Ruiz, after Rafferty took down signs Ruiz had placed in the women's restroom that Rafferty believed were offensive and discriminatory to people with disabilities. Ruiz was upset that Rafferty took down the signs and grabbed Rafferty's wrist to try to pull her out of her cubicle. Ruiz also repeatedly slapped Rafferty's leg, screamed

---

[3] Throughout this decision, deposition testimony citations are to the specific page number of the deposition. By contrast, all other references to specific pages of exhibits, briefing, or any other document, cite the ECF-generated page number.

at Rafferty about "being nasty to DOE," and insisted the signs should not have been taken down. Dkt. 4, at ¶ 31. Distraught over the incident and concerned about the physical nature of the conflict, Rafferty filed an incident report with the Idaho Falls Police Department. Rafferty also filed a workplace violence complaint.

Although Ruiz was purportedly reprimanded by DOE-ID for physically assaulting Rafferty, JTS refused to address the situation, and ultimately told Rafferty that allegations had been made against her and things "could get ugly." *Id.* at ¶ 35. JTS's management and Human Resources would not tell Rafferty what the allegations against her were. On July 10, 2014, Lashinki told Rafferty she had two options: resign or be terminated. Lashinki was very upset and told Rafferty he did not want to let her go. He confided that Perkins had offered JTS a sole source contract if JTS would fire Rafferty and that "this was just business." *Id.* at ¶ 36. Rafferty decided to resign and was given a severance by JTS. In exchange, Rafferty signed an agreement which explicitly released JTS from all claims arising out of Rafferty's employment with JTS.

    2.  <u>Rafferty's employment with KeyPoint</u>

On or about September 26, 2014, KeyPoint conditionally offered Rafferty an investigator position. In 2014, KeyPoint performed background investigation services under a contract with OPM. Because of the sensitive nature of the work, OPM had to grant each individual investigator access to its contract before the investigator could begin working. Upon hiring her, KeyPoint submitted Rafferty's information to OPM to request that OPM allow her access to its contract.

OPM and KeyPoint formally communicated about KeyPoint investigators working on OPM's contract through a proprietary OPM computer program called "PIPS." Dkt. 63 at ¶ 6. On October 14, 2014, OPM sent KeyPoint a message via PIPS granting Rafferty access to its contract based on the recent PR of Rafferty's security clearance that had occurred while she was still employed with JTS. However, in order for Rafferty to maintain this access, OPM asked that she complete an updated background investigation form— known as an "SF-86"—with any new information that had developed since Rafferty's prior background investigation closed on May 21, 2014. Dkt. 66-24, at ¶ 14.

On or about October 20, 2014, Rafferty completed the SF-86 and transmitted it electronically directly to OPM. As required, Rafferty disclosed financial information, medical information, and other sensitive and personal matters on her SF-86. Upon review of Rafferty's SF-86, OPM submitted a request for a Reimbursable Suitability/Security Investigation ("RSI").[4] The RSI specifically identified the scope of the investigation as follows: "Please conduct the following investigation. . . [o]btain record coverage and witness testimony to resolve [JTS] employment separation. Obtain mental health coverage with listed provider. Conduct sufficient investigation to resolve these matters and provide the result to OPM-Contractor Adjudications as soon as possible." Dkt. 66-19, at 73. On

---

[4] As the Court has previously explained, an RSI "is not a background or criminal investigation," but rather, is an investigation an agency can initiate when it needs additional information "to resolve issues (such as alcohol or drug rehabilitation or credit) that might fall outside the normal scope of an investigation; to establish a history or pattern of behavior, or to obtain other information related to suitability or security." Dkt. 58, at 4 n. 1 (quoting https://www.opm.gov/faqs/QA.aspx?fid=dced14fa-6c18-418f-a4d6-ec43e2554718&pid=0e896aab-d836-4bcf-9bc7-9b9042c125b2).

October 23, 2014, OPM also added that the Idaho Falls Police Department should be contacted to obtain Rafferty's July, 2014 assault report against Ruiz. *Id.*

On December 1, 2014, Rafferty began her employment with KeyPoint, and started training with a KeyPoint employee named Glenn Young. On December 10, 2014, Rafferty and Young went to the DOE-ID PERSEC in order to review files as part of their investigative duties for KeyPoint. When Rafferty and Young arrived at the office, they had to wait a significant period of time to obtain an escort to allow them entrance into the facility. Rafferty alleges both the lengthy wait and being escorted were unusual and were not JTS's protocol while she worked there. In addition, Longua—who had since taken over Rafferty's former position as Program Manager for JTS—was the individual who eventually escorted Rafferty and Young while they were in the office. Longua asked Young for his business card, claiming he collected them. Rafferty contends this was suspicious, and that it indicated Longua was attempting to gather information about her new employment. When Rafferty commented on the day's peculiarity, Longua responded that PERSEC was doing things differently, and that investigators were no longer allowed to be unescorted. Despite the uncomfortable visit to PERSEC, Rafferty's training progressed well and Young gave Rafferty a high rating on her participation and understanding of KeyPoint's protocols.

On or about December 16, 2014, three phone calls were made from the phone number assigned to Perkins at the DOE-ID PERSEC office to KeyPoint. Perkins cannot explain why the calls were made from his number or who would have contacted KeyPoint from his phone. He does not remember ever calling KeyPoint. Perkins testified during his

deposition that he was also one of only two individuals at DOE-ID with a hard-walled office, that he locked his office whenever he was not there, and that he never made business calls when anyone else, including Longua, was in his office. Longua and KeyPoint's Executive Vice President of Program Management, Angela Deabler, also confirmed during their depositions that there would be no reason for either JTS or DOE-ID to contact KeyPoint. While the calls only lasted a combined three minutes, neither JTS nor KeyPoint claim to have any knowledge regarding why such calls were made. Rafferty suggests that either Longua, or Perkins (at Longua's instigation) contacted KeyPoint in an attempt to get her fired.

On December 18, 2014, an OPM employee, Pamela Hindman, sent KeyPoint a message via PIPS with the subject, "SUSPEND – RAFFERTY." Dkt. 63, at ¶ 23. The body of the message stated, "THE FOLLOWING INDIVIDUAL HAS BEEN SUSPENDED. PLEASE CANCEL PIPS ACCESS AND THEIR FACILITY ACCESS HAS BEEN RESCINDED." *Id*. Below the message was the name: "RAFFERTY, CONSTANCE RENE." *Id*. The parties dispute whether this message meant Rafferty's security clearance was suspended, or, instead, that her access to work on OPM's contract suspended.[5] The parties also dispute whether KeyPoint or OPM initiated Rafferty's suspension.

Rafferty contends that KeyPoint terminated her on December 19, 2014, and that KeyPoint's Human Resources Department stated she was being terminated because her

---

[5] KeyPoint notes that while individuals sometimes refer to access to OPM's contract as a "clearance," because the OPM must "clear" them to work on its contract, obtaining or maintaining a government security clearance is a different process from obtaining or maintaining access to the OPM contract. Dkt. 63, at ¶ 4 n. 2.

security clearance had been suspended. Rafferty alleges an abrupt suspension of a security clearance normally occurs only if a serious crime or criminal activity is involved—neither of which had occurred at the time her clearance was suspended. Rafferty also notes that had OPM suspended her security clearance, she would have received notice and an opportunity to contest the suspension. Because she did not receive such notice, Rafferty subsequently sent an information request to OPM to determine what happened. Rafferty alleges an OPM employee informed her that it was KeyPoint, and not OPM, who had initiated Rafferty's suspension.

KeyPoint counters that Rafferty's security clearance was not suspended, but that OPM instead suspended Rafferty's access to work on its contract. KeyPoint maintains that it does not make requests to suspend an employee from OPM's contract, and that only OPM can make such decisions. KeyPoint asserts that it did not know—and still does not know—why OPM suspended Rafferty's access to OPM's contract. However, because Rafferty purportedly could not do any aspect of her role as an investigator for KeyPoint without access to OPM's contract, Maureen O'Connor, the security specialist for KeyPoint who was responsible for communicating with OPM about KeyPoint investigators' access to the OPM contract, immediately notified relevant KeyPoint managers about OPM's decision. Angela Deabler, who at the time, was program director overseeing operations related to KeyPoint's contract with OPM, made the decision to terminate Rafferty the same day. Deabler had the sole responsibility for deciding to terminate Rafferty, had never met Rafferty, and was only tangentially acquainted with her name because Rafferty was a KeyPoint trainee.

Rafferty's employment with KeyPoint was terminated effective December 19, 2014. Per OPM protocol, KeyPoint notified OPM on December 22, 2014, that Rafferty's employment had been terminated "'while on suspension from access to the OPM contract." Dkt. 63, at ¶ 35. As a result of the notice of termination, OPM discontinued Rafferty's background investigation (the RSI) since KeyPoint was no longer requesting access for her.

Rafferty suggests that regardless of whether OPM suspended Rafferty's access to its contract only in response to her termination by KeyPoint or not, there is no dispute that KeyPoint requested all processing on Rafferty's RSI to stop. Rafferty contends OPM suspended her access as a formality because KeyPoint had terminated her and that, if KeyPoint had not terminated her, OPM would have continued working on her RSI and ultimately reinstated her access to its contract. Rafferty alleges KeyPoint's motivation for terminating her was thus illegitimate, noting other KeyPoint employees in the clearance process were not terminated while their access was suspended, and that she was treated differently from such similarly situated employees.

3. Post-termination proceedings

After KeyPoint terminated her, Rafferty filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Michael Hegedus, KeyPoint's Corporate Security Director, conducted an internal investigation in response to Rafferty's Complaint. At the end of his investigation, Hegedus produced a report, which KeyPoint's counsel used in responding to Rafferty's EEOC complaint. KeyPoint's EEOC response stated: "On December 18, 2014, OPM suspended Ms. Rafferty's clearance and access due

to 'significant issues developed on SF86' since her previous periodic review of her clearance." Dkt. 48-5, at 2–3.

KeyPoint maintains that it does not perform background investigations on its own current or potential investigators, and that it is impossible for any KeyPoint investigator to access another current or potential KeyPoint investigator's SF-86. KeyPoint contends it never had any access to either Rafferty's SF-86 or to any of the information in it. Rafferty counters that KeyPoint could not have known there were purportedly "significant issues" with her SF-86 if it had not improperly accessed her SF-86.

Rafferty subsequently filed the instant suit against JTS and KeyPoint. Rafferty believes KeyPoint, at either Longua or Perkins' instigation, inappropriately reviewed her SF-86 and used her disclosure of a mental health disorder and/or treatment as a basis for firing her. However, when Rafferty attempted to obtain discovery regarding where the "significant issues" language came from, KeyPoint claimed the quoted language came from a telephone conversation. KeyPoint subsequently asserted the quoted language was merely a stylistic choice by the lawyer who drafted the EEOC complaint response.

During her initial deposition as KeyPoint's Rule 30(b)(6) designee, Deabler also stated she did not know where the "significant issues" language came from. Yet, KeyPoint later moved for a protective order and provided portions of Hegedus's report over which it had previously claimed privilege. KeyPoint's Motion for Protective Order illustrated that the EEOC response quoted the "significant issues" language from Hegedus's report. Specifically, the report (which was sent by email and informal) outlined Rafferty's short employment with KeyPoint, stating:

So here is what happened:

10/14/14 OPM granted a Final Favorable adjudication based on a previously completed PR dated 5/2014.

OPM asked for an updated SF86.

Updated SF86 returned to OPM (date unknown)

12/1/14  Rafferty began NIT [New Investigator Training]

12/18/14 OPM suspended access due to significant issues developed on SF86 since previous PR. OPM scheduled RSI to investigate issues. Employee termed per KeyPoint OPS.

12/22/14 PIPS message sent by Security to OPM regarding terminating subject. OPM discontinued RSI and did not continue investigation.

Dkt. 66-9.

After an *in camera* review of Hegedus's report, the Court determined it was not privileged and ordered KeyPoint to produce it. The Court also reopened discovery for a limited period to, *inter alia*,  allow Rafferty an opportunity to seek discovery regarding Hegedus's report and to conduct a second 30(b)(6) deposition of Deabler.

### 4.  Reopened discovery and summary judgment

Once discovery was reopened, Rafferty served, and KeyPoint answered, additional written discovery requests. Rafferty also obtained documents from the OPM, deposed Perkins, and took a second 30(b)(6) deposition of Deabler. Rafferty did not depose Hegedus.

KeyPoint and JTS subsequently filed the instant Motions for Summary Judgment. Dkts. 61; 64. JTS included a Motion to Seal (Dkt. 64-6) as an attachment to its Motion for Summary Judgment. Rafferty responded and also filed her own Motion to Seal (Dkt. 67),

as well as a Motion to Strike Declaration of Kernan Longua and Exhibits to Declaration of

Angela Deabler (Dkt. 68). JTS followed with a Motion for Extension of Time to File *Errata*

Declaration of Kernan Longua (Dkt. 69), and also filed Longua's corrected declaration

(Dkt. 70). Finally, KeyPoint objected to certain statements and evidence Rafferty included

with her Response to the Motion for Summary Judgment and moved to strike the same.

Dkt. 72-2. The motions have been fully briefed, the Court held a lengthy hearing on all

pending motions, and the matters are now ripe for the Court's review.

### III.    ANALYSIS

Because there are seven motions with different applicable legal standards, the Court

sets forth the appropriate legal standard (where necessary) with respect to each motion.

Although filed after the dispositive motions, the Court addresses the procedural motions

before turning to the substance of JTS and KeyPoint's motions for summary judgment.

### A. Motions to Seal (Dkts. 64-6 and 67)

JTS and Rafferty both request that the Court seal documents referencing Rafferty's

confidential medical and employment history, as well as JTS's personnel and employment

records. Rafferty also seeks to seal records related to her employment at KeyPoint, as well

as to the employment of other KeyPoint employees. In addition, KeyPoint filed certain

documents under seal without a corresponding motion.

The parties essentially seek a blanket seal of nearly one-thousand pages of

documents without specifying which documents are appropriately sealed due to

confidential medical, employment, or personnel information. For instance, Rafferty seeks

to have every document she filed in support of her responses to both defendants' motions

for summary judgment—including her memorandum and statement of facts—under seal. JTS first filed its Memorandum in Support of Summary Judgment publicly, but then later filed its Memorandum under seal. *Compare* Dkt. 64-1 *with* Dkt. 65. JTS also filed nine exhibits and its entire Reply brief under seal. Finally, Keypoint filed seventy-three pages of deposition testimony, its Reply brief, and every document filed in support of its Reply brief under seal.

### 1. Legal Standard

Courts recognize a general right to inspect and copy public records and documents, including judicial records and documents. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (internal quotation marks and citation omitted). Documents that have been traditionally kept secret, including grand jury transcripts and warrant materials in the midst of a pre-indictment investigation, come within an exception to the general right of public access. *Id*. Otherwise, "a strong presumption in favor of access is the starting point." *Id*. (citing *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). A party seeking to seal a judicial record bears the burden of overcoming this strong presumption by showing that "compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure[.]" *Kamakana*, 447 F.3d at 1178–79.

In deciding whether to seal specific filings, the trial court must weigh relevant factors including, "the public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets." *Pintos v. Pac. Creditors Ass'n*, 605

F.3d 665, 679 n. 6 (9th Cir. 2010) (internal quotation marks and citation omitted). While the decision to grant or deny a motion to seal is within the trial court's discretion, the court must articulate its reasoning in deciding a motion to seal. *Id*. at 679.

    *2.  Analysis*

    The Court recognizes that the need to protect medical privacy has qualified as a "compelling reason," for sealing records in connection with a dispositive motion. *See, e.g., Bloss v. Twin Falls Cty.*, 2017 WL 3659164, at *7 (D. Id. Aug. 24, 2017) ("Courts have routinely recognized the sensitive and confidential nature of medical records as a "compelling reason" for their sealing.); *Gable v. Washington Corr. Ctr. for Women*, 2018 WL 5295809, at *3 (W.D. Wash. Oct. 25, 2018); *Gary v. Unum Life Ins. Co. of Am*., 2018 WL 1811470, at *3 (D. Ore. Apr. 17, 2018) (citing cases and finding no case where medical information was not allowed to be filed under seal under the "compelling reasons" standard); *San Ramon Reg'l Med. Ctr., Inc. v. Principal Life Ins. Co*., 2011 WL 89931, at *1 n. 1 (N.D. Cal. Jan. 10, 2011) (finding the need for protecting confidential medical information outweighed any necessity for disclosure, and sealing medical records sua sponte).

    Similarly, courts have held employment and personnel records are appropriately sealable. *See, e.g*., *Seals v. Mitchell*, 2011 WL 1233650, at *3 (N.D. Cal. Mar. 30, 2011) (granting motion to seal employment and personnel records because of a need for confidentiality); *Cross v. Jaeger*, 2016 WL 4499414 (D. Nev. Aug. 26, 2016) (upholding Magistrate Judge's determination that compelling reasons existed to prevent public disclosure of confidential personnel and employment records).

The balance between the need for the public's access to information about Rafferty's medical history and personnel and employment records, as well as the confidentiality of employment and personnel records of other KeyPoint employees who are not parties to this suit, weighs in favor of sealing certain exhibits. However, as mentioned, both JTS and Rafferty seek blanket sealing of hundreds of pages of documents—including the entirety of their respective briefing on the Motions for Summary Judgment—regardless of whether such documents actually contain any private medical, employment, or personnel information. JTS and Rafferty also seek to seal documents and information that is already part of the judicial record, and that has already been disclosed publicly (in some instances for months or years) by the parties. *See, e.g.*, Dkt. 4; Dkt. 61; Dkts. 61-4–61-18; Dkt. 64-1; Dkt. 64-2. As mentioned, without a motion, KeyPoint also filed its Reply brief, supporting documents, and certain deposition transcripts under seal.[6] Dkts. 62; 72; 76.

With the exception of limited documents which all of the parties recognize are confidential and which clearly disclose Rafferty's or other KeyPoint employees' personal employment or medical history, the parties have not presented "articulable facts identifying the interests favoring continued secrecy" with respect to the specific documents they seek to have sealed. *Kamakana*, 447 F.3d at 1181. As the Ninth Circuit has explained, "[s]imply mentioning a general category of privilege [such as medical privacy], without any further

---

[6] Although KeyPoint suggests excerpts of the deposition transcripts for Deabler and Rafferty were appropriately filed under seal because they were designated Confidential under the Protective Order entered in this case (Dkt. 76, at 2), the "presumption of access is not rebutted where . . . documents subject to a protective order are filed under seal as attachments to a dispositive motion." *Foltz*, 331 F.3d at 1136. Instead, the "compelling reasons standard continues to apply." *Id*.

elaboration or any specific linkage with the documents, does not satisfy the burden" to show compelling reasons to seal information from public access. *Id*. at 1184. Nor is it the Court's responsibility to undertake a detailed examination of the nearly one-thousand pages the parties have filed under seal to ascertain which of the filings contain confidential medical, employment, or personnel information. *Mack v. Dearborn Nat'l Life Ins. Co*., 2014 WL 12572866, at *2 (E.D. Cal. Aug. 26, 2014).

The Court accordingly GRANTS JTS's Motion to Seal (Dkt. 64-6) in PART and seals: Dkt. 65-5; Dkt. 65-6; and Dkt. 65-9. The Court similarly GRANTS Rafferty's Motion to Seal (Dkt. 67) IN PART and seals: Dkt. 66; Dkt. 66-8; 66:14; Dkt. 66-15; and 66-18.

Rafferty and JTS's Motions to Seal are otherwise DENIED, as is KeyPoint's attempt to file documents under seal without filing a Motion to Seal in support, as required under District of Idaho Local Civil Rule 5.3. Despite KeyPoint's failure to file a Motion to Seal, the Court will, however, seal Dkt. 62, Dkt. 62-1, and Dkt. 76-2 because they include excerpts of Rafferty's deposition regarding her confidential medical condition, and, Dkt. 72, Dkt. 72-1, and Dkt. 76-2 because they contain details regarding other KeyPoint employees' personal employment information.

The Clerk of the Court shall keep all documents filed in this case since September 13, 2019, sealed for thirty (30) days after the date of this order. If the parties have not submitted a statement identifying specific documents which should be kept sealed for specific reasons within this thirty-day period, all documents (with the exception of those expressly referenced above) filed since September 13, 2019, will be unsealed.

**B. Rafferty's Motion to Strike (Dkt. 68) and JTS's Motion for Extension of Time to File *Errata* Declaration of Kernan Longua (Dkt. 69)**

Rafferty seeks to strike certain exhibits attached to the Declaration of Angela Deabler in Support of KeyPoint's Motion for Summary Judgment, and also seeks to strike the Declaration of Kernan Longua filed in Support of JTS's Motion for Summary Judgment. Rafferty argues Deabler did not provide proper foundation for various exhibits attached to her Declaration and asks the Court to strike such exhibits for failure to comply with Rules 603 and 901 of the Federal Rules of Evidence.[7] Dkt. 68-1, at 2. Rafferty also identifies an error in Longua's Declaration and suggests this error renders Longua's Declaration so incomplete as to be inadmissible and irrelevant. *Id.* at 3 (citing Federal Rule of Evidence 403).

    *1.  Exhibits attached to Declaration of Angela Deabler*

    a.  <u>Legal Standard</u>

Authentication is a condition precedent to admissibility, which is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). A deposition or an extract therefrom "is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (citations omitted). A deposition transcript or excerpt that lacks the reporter's certification and/or the names of the deponent and the action lacks foundation and is appropriately excluded. *Id.*;

---

[7] Specifically, Rafferty seeks to strike exhibits A, B, D, E, F, J, L, N and O (respectively, Dkts. 61-6; 61-7; 62; 62-1; 61-9; 61-13; 61-15; 61-17; and 61-18).

*see also Pavone v. Citicorp Credit Servs., Inc.*, 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997) (excluding a deposition transcript filed without a signed reporter's certification form).

　　b.　Exhibits A, B, D, E, and N

Rafferty does not substantively challenge the authenticity of any of the exhibits attached to Deabler's Declaration, but argues Exhibits A, B, D, E—each of which are excerpts from various deposition transcripts—are not properly authenticated because KeyPoint failed to include the reporter's certification that the transcript was a true record of the testimony of the deponent. In addition, the excerpt from the transcript of Lashinki's deposition—Exhibit N to Deabler's Declaration—omitted the reporter's certification and the cover page identifying both Lashinki and the name of this action.

In response to Rafferty's motion, KeyPoint filed an *Errata* and refiled Exhibits A, B, D, and E with the reporter's certification for each deposition. Dkts. 75-1; 75-2; 76-1; and 76-2. KeyPoint also refiled Exhibit N—Lashinki's deposition—with both the reporter's certification and appropriate cover page. Dkt. 75-3. KeyPoint argues the omissions were inadvertent and, as such, suggests striking the exhibits would be inappropriate. Rafferty counters that KeyPoint's *Errata* is itself inappropriate because it was filed without stipulation or leave of the Court and suggests the Court should still strike Exhibits A, B, D, E, and N.

Although the Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment," here KeyPoint appropriately filed authenticated copies of Exhibits A, B, D, E, and N when Rafferty identified the error in her Motion to Strike. *Orr*, 285 F.3d at 773. Unlike in *Orr*, where authenticated exhibits

were apparently never submitted to the court, here the record contains the authenticated transcripts. Rafferty has not cited any authority to suggest the Court cannot consider appropriately authenticated exhibits, even if such exhibits were first inadvertently filed without the reporter's certification. Nor has Rafferty identified any prejudice she would suffer if the Court considers the authenticated deposition transcripts. Rafferty's counsel was clearly present for each of the depositions from which such excerpts were taken, and Rafferty herself, with her Response to KeyPoint's Motion for Summary Judgment, filed authenticated excerpts from four of the five transcripts from which KeyPoint submitted excerpts. *See*, Dkt. 66-10; Dkt. 66-13; Dkt. 66-14; Dkt. 66-15.

Rafferty argues "[w]hile the failure to comply with the federal rules can lead to seemingly harsh consequences, the rules are in place for a reason and must be followed if our judicial system is to retain its utility, predictability, and integrity." Dkt. 77, at 4. Although KeyPoint should have caught its error before Rafferty filed her Motion to Strike (or simply filed appropriately authenticated exhibits in the first place) attorneys are human and, particularly in a case with a history as long, or a record as large, as this one, can make mistakes. There is no reason to penalize KeyPoint for an inadvertent filing error that did not impact Rafferty's ability to respond to KeyPoint's Motion for Summary Judgment, and that was corrected months before the hearing on KeyPoint's Motion for Summary Judgment even occurred. Moreover, the scope and purpose of the federal rules is to ensure "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. of Civ. Proc. 1. The Court cannot see how striking appropriately authenticated documents

from the record would accomplish the just resolution of this action. The Motion to Strike is accordingly DENIED with respect to Exhibits A, B, D, E, and N.

    c.  <u>Exhibits F, J, L, and O</u>

Rafferty also asks the Court to strike Exhibits F, J, L, and O to KeyPoint's Motion for Summary Judgment because KeyPoint failed to appropriately authenticate such documents. Again, Rafferty does not substantively challenge the authenticity of any of these documents, but instead relies on KeyPoint's lack of formal procedural authentication of the exhibits.

Exhibit F (Dkt. 61-9) consists of documents OPM produced to Rafferty's counsel. Dkt. 61-9. These documents are authenticated by the attestation certificate included on the second page, which explains the source of the records kept by a government agency and offers sworn testimony that they are true, accurate, and complete copies of the original documents. Because Exhibit F is self-authenticating, the Motion to Strike is accordingly DENIED with respect to this exhibit. Fed. R. Evid. 902 (providing self-authenticating documents need no extrinsic foundation).

Each of the other exhibits Rafferty seeks to strike are already in the record and have been appropriately authenticated by Rafferty and/or JTS. Specifically, Exhibit J (Dkt. 61-13) is a February 27, 2015 letter OPM sent to Rafferty's counsel. Rafferty included the same letter, which her attorney authenticated, with her Response to KeyPoint's Motion for Summary Judgment. Dkt. 66-4, at 22; Dkt. 66-2, at ¶ 6. Similarly, Exhibit L (Dkt. 61-15) consists of emails between KeyPoint's Sue Rankin and Rafferty on the day of, and two days after, Rafferty's termination. Rafferty testified about such emails during her

deposition, filed the authenticated portion of her transcript regarding such emails, and also submitted the emails themselves—which were authenticated by Rafferty's counsel—with her Response to KeyPoint's Motion for Summary Judgment. Dkt. 66-15, at 19–20; Dkt. 66-2, at ¶ 19. Finally, Exhibit O (Dkt. 61-18) consists of phone records produced by the DOE. The same phone records were also filed (and properly authenticated) by both Rafferty and JTS. Dkt. 66-18, at ¶ 28; Dkt. 66-22, at 3–4; Dkt. 70, at ¶ 15; Dkt. 71-1.

Documents that have been authenticated by one party are authentic with respect to all parties. *Orr*, 285 F.3d at 776. Rafferty argues KeyPoint cannot rely on her authentication because KeyPoint filed such exhibits *before* Rafferty did, and thus could not make reference to Rafferty's exhibits when it filed them. Although the Court agrees that KeyPoint should have appropriately authenticated its exhibits at the time of filing, and although the Court would strike the exhibits if the same exhibits were not already in the record and authenticated by the other parties, it is a waste of time to file a motion to strike exhibits which are clearly appropriately before the Court. *Id*. (holding district court manifestly erred in its decision to exclude an exhibit for inadequate authentication where the exhibit was properly authenticated by the opposing party). Even if the Court granted Rafferty's Motion and struck the exhibits, it still could, and would, consider such exhibits in resolving KeyPoint's Motion for Summary Judgment because Rafferty herself authenticated, submitted, and relied on such exhibits in her Response. The Motion to Strike Exhibits J, L, and O is accordingly DENIED.

   *2. Kernan Longua Declaration*

Rafferty seeks to strike the Longua Declaration based on an inconsistency between the fourth and fifth pages. Given the inconsistency, Rafferty suggests "[i]t appears that Longua signed a different version of the declaration than the version JTS submitted." Dkt. 68-1, at 3. Shortly after Rafferty filed her Motion to Strike, JTS filed its Motion for Extension of Time, conceding that the initial Longua Declaration was not the correct draft and was filed due to an administrative error. JTS's counsel explained in detail both how the mistake was made, and why it did not have any impact on the substantive issues raised in JTS's Motion for Summary Judgment. Dkt. 69-1; Dkt. 69-2. JTS sought the Court's leave to file the correct Longua Declaration (and attached exhibits) pursuant to the "excusable neglect" provision for extending time under Federal Rule of Civil Procedure 6(b). JTS also filed the correct version of Longua's Declaration, and attached the exhibits referenced in Longua's corrected Declaration, the same day it filed the Motion for Extension of Time. Dkts. 70, 71, 71-1.

a. Legal Standard

The Ninth Circuit has held that, for purposes of Federal Rule of Civil Procedure 6(b), "excusable neglect" must be judged by the standard set forth in *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993). *See, e.g., Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997) (noting "this court [has] held that the Supreme Court's analysis of 'excusable' neglect in *Pioneer* is applicable to Rule 6(b)[.]") (citation omitted). Under this standard, the Court considers four factors to determine whether neglect is excusable: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for

the delay; and (4) whether the movant acted in good faith. *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223–24 (9th Cir. 2000) (citing *Pioneer*, 507 U.S. at 395).[8]

    b.  <u>Analysis</u>

    Here, each of the four factors weigh against striking Longua's Declaration. First, the error did not prejudice Rafferty's ability to respond to JTS's Motion for Summary Judgment, as Rafferty addressed and responded to the issues raised in Longua's Declaration throughout her Statement of Facts and Response to JTS's Motion for Summary Judgment. In fact, when the corrected version of Longua's Declaration is compared with the initial version, only one line and one reference to Exhibit B is omitted in the initial version. *Compare* Dkt. 64-5, at 4–5 *with* Dkt. 70, at 4–5. Although the reference to Exhibit B (the DOE's phone records) is omitted in the initial version, Rafferty focused on, and also submitted the same phone records, with her Response to JTS's Motion for Summary Judgment. Dkt. 66-1, at 11–13; Dkt. 66-22. Rafferty had the phone records and was thus not prejudiced by the omission of reference to the appropriate exhibit in the initial Longua Declaration. Moreover, the error could have easily been corrected long before her Response was due had Rafferty's counsel simply notified JTS's counsel of the mistake rather than waiting to file a Motion to Strike three weeks after the initial version of Longua's Declaration was filed.

    Second, the length of the delay and its potential impact on the proceedings was minimal, as the error was corrected as soon as JTS learned of the issue—before the hearing

---

[8] These factors are not exclusive. *Briones*, 116 F.3d at 381. Instead, excusable neglect is a somewhat "elastic concept" which may be found where the relevant circumstances reveal inadvertent delays, mistakes, or carelessness. *Id*.; *Pioneer*, 507 U.S. at 388.

on JTS's Motion for Summary Judgment had even been set—and months before the hearing actually occurred.

Third, JTS has sufficiently explained the reason for the delay. Specifically, the signature page for version "2" of the Longua Declaration was initially inadvertently filed with the first few pages of version "3" of Longua's Declaration. Dkt. 69-1, at 4. Instead of version "2," the signature page of Longua's Declaration should have been for the third and final version of his Declaration. *Id*. JTS did not intend to file the incorrect signature page or to create any confusion, and instead simply inadvertently compiled the signature page for version "2" with the appropriate draft of version "3." *Id*.

Finally, Rafferty suggests JTS acted in bad faith because JTS's filings in support of the Motion for Extension of Time illustrate that paragraph 14 of version "2" is substantively different from paragraph 14 of version "3." Dkt. 77, at 6–7. Rafferty contends this substantive difference calls into question the reliability and completeness of both the initial Longua Declaration and corrected Longua Declaration. *Id*. However, as documented by JTS's counsel, the signature page for version "2" was never meant to be filed, and the *unfiled* paragraph 14 of version "2" was in fact omitted from both the initial Longua Declaration and corrected Longua Declaration. In both of the filed versions of Longua's Declaration, paragraph 14 states: "I was never contacted by OPM, KeyPoint or any prospective employer concerning Rafferty. Further, I never contacted OPM, KeyPoint or any prospective employer [regarding] anything about Rafferty." *Compare* Dkt. 64-5, at ¶ 14 *with* Dkt. 70, at ¶ 14.

Longua also confirmed during his deposition that he was never contacted by, and never himself contacted, OPM, KeyPoint, or any other prospective employer regarding Rafferty. Dkt. 66-11, at 109:2–110:7. While a substantive difference between the *filed* declarations, or between the filed declarations and Longua's testimony, may have been a cause for concern, declarations are frequently revised and updated in preparation for filing and there is no inconsistency between Longua's testimony and either of the declarations that were *actually* filed with the Court. As such, the Court does not find any indication of bad faith with respect to the initial and corrected Longua Declarations.

Although the four *Pioneer* factors weigh in favor of admitting the corrected Longua Declaration due to excusable neglect, Rafferty argues the Court should still exclude it because it was not timely filed with JTS's Motion for Summary Judgment. Dkt. 77, at 6. Rafferty suggests "JTS cannot refile Longua's defective declaration after the time set out in the [Federal and Local] Rules has passed." *Id*. However, Rafferty herself failed to file a Response to JTS's Motion for Extension of Time by her deadline of October 30, 2019, and instead belatedly responded on November 8, 2019, through her Reply in Support of her Motion to Strike. Since Rafferty untimely opposed JTS's Motion to Extend Time through her Reply brief on the Motion to Strike, the Court could find she consented to granting the Motion to Extend Time pursuant to District of Idaho Local Civil Rule 7.1(e)(1). The Court does not so find, but instead highlights the issue to again show that attorneys—even those for Rafferty—occasionally make mistakes. When such mistakes are not substantive and do not prejudice either side, Rule 1's focus on securing a just and inexpensive resolution of

every action is served by allowing attorneys room to correct procedural errors that do not prejudice the opposing side. Fed. R. Civ. Proc. 1.

In sum, the Court finds JTS's error in filing the incorrect signature page with the initial Longua Declaration was due to excusable neglect. Rafferty's Motion to Strike Longua's Declaration (Dkt. 68) is accordingly DENIED and JTS's Motion for Extension of Time (Dkt. 69) is GRANTED. The Court will consider the corrected Longua Declaration (Dkt. 70) when evaluating JTS's Motion for Summary Judgment.

### C.  KeyPoint's Motion to Strike (Dkt. 72-2)

KeyPoint objects to, and moves to strike, Rafferty's submission of hearsay statements purportedly made by agents of OPM to both Rafferty and her counsel. KeyPoint also seeks to exclude deposition testimony Rafferty cited without providing specific page and line numbers. Finally, KeyPoint suggests the Court should strike Rafferty's assertions that either do not cite to any evidence in the record or are not supported by the citations Rafferty provides.

*1.  Hearsay Statements*

a.  Legal Standard

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, "offered in evidence to prove the truth of the matter asserted[.]" Fed. R. Evid. 801(c). "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804, or 807." *Orr*, 285 F.3d at 778.

b.  Analysis

Rafferty cites to various statements purportedly made by agents of OPM to Rafferty and/or her counsel in her Declaration, her counsel's Declaration, deposition testimony, Statement of Disputed Facts, and Response to KeyPoint's Motion for Summary Judgment. Specifically, Rafferty contends various agents of OPM told both Rafferty and her counsel that KeyPoint, and not OPM, suspended Rafferty's access to OPM's contract. Dkt. 66-18, at ¶¶ 25–26; Dkt. 66-20; Dkt. 66-2, at ¶ 5; Dkt. 66-15, at 118:17–22; Dkt. 66-24, at ¶¶ 41, 45–46; Dkt. 66, at 4, 8. Rafferty offers such statements to establish the truth of the matter asserted—that KeyPoint, and not OPM, suspended her. The aforementioned citations are thus hearsay, and Rafferty has not identified any exception to the hearsay rule which would allow for their admission.[9] Under such circumstances, the evidence regarding OPM's purported statements to Rafferty and to her counsel is inadmissible and cannot be considered on summary judgment. *Orr*, 285 F.3d at 779. The Court Grants this portion of KeyPoint's Motion to Strike.

### 2. *Deposition Testimony*

KeyPoint also asks the Court to exclude deposition testimony for which Rafferty did not provide specific page and line numbers. Rafferty did not cite to any line numbers for deposition testimony cited in her Statement of Disputed Facts and Memorandum in Response to KeyPoint's Motion for Summary Judgment. KeyPoint does not move to

---

[9] During oral argument, Rafferty's counsel argued that evidence containing hearsay is not inadmissible when submitted on summary judgment, and that such evidence can come in to be used for notice or to provide context for other evidence. While, under Federal Rule of Civil Procedure 56(c) and (e), deposition testimony is normally admissible on summary judgment—even though it would constitute inadmissible hearsay when submitted at trial—evidence is properly excluded at the summary judgment stage where its contents contain inadmissible hearsay. *Orr*, 285 F.2d at 779 n. 27. Here, the contents of the evidence Rafferty references are hearsay and are inadmissible even on summary judgment *Id*.

exclude all deposition testimony cited by Rafferty, but instead suggests the Court should strike specific portions of Rafferty's Statement of Disputed Facts and Response where Rafferty generally cites to between four and twenty-four pages of deposition testimony. Dkt. 72-2, at 5–6 (citing Dkt. 66-24, at ¶¶ 36–37, 47; Dkt. 66, at 10–12).

When a party relies on deposition testimony in a summary judgment motion or opposition without citing to specific page and line numbers, the trial court may in its discretion exclude such evidence. *Orr*, 285 F.3d at 775. However, as explained with respect to Rafferty's Motion to Strike, the Court is concerned with the just resolution of this case and not with procedural defects that do not involve the merits of the parties' respective positions. While Rafferty's counsel should have cited specific page and line numbers, and must do so in the future, the Court is capable of determining whether or not the deposition testimony Rafferty cites without specific page or line numbers supports her contentions.

The Court accordingly DENIES KeyPoint's Motion to Strike with respect to the deposition testimony cited by Rafferty and will consider such testimony despite Rafferty's failure to provide specific page and line numbers.

### 3. *Facts without Support in the Record*

Finally, KeyPoint objects to, and moves to strike, Rafferty's assertions that either do not cite to any evidence in the record or are allegedly not supported by the citations she provides. Specifically, KeyPoint seeks to strike portions of five paragraphs in Rafferty's Statement of Facts and three statements in Rafferty's Response to KeyPoint's Motion for Summary Judgment. Dkt. 72-2, at 8–9 (citing Dkt. 66-24, at ¶¶ 7, 12, 14, 16, 49; Dkt. 66, at 3, 7).

On summary judgment, the Court's function is to consider the evidence and determine whether such evidence establishes the absence or presence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(B). The Court is perfectly capable of determining whether Rafferty—or KeyPoint—have properly supported their assertions with admissible evidence. The Court will give the evidence KeyPoint seeks to strike the weight it deems appropriate.

The Motion to Strike is accordingly DENIED with respect to facts purportedly without support in the record.

### D. Motions for Summary Judgment

### *1. Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp*., 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her]

favor." *Id*. (citation omitted). On the other hand, as the Supreme Court has made clear: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Because Rafferty's employment with JTS preceded her employment with KeyPoint, the Court first turns to JTS's Motion for Summary Judgment.

### 2.  *JTS's Motion for Summary Judgment (Dkt. 64)*

JTS seeks summary judgment on each of Rafferty's claims against it. JTS first argues that, to the extent any of Rafferty's claims are based on actions that occurred during her employment with JTS, such claims are barred by Rafferty's execution of a Release and acceptance of severance benefits. JTS also argues any claims that accrued during Rafferty's employment with JTS are barred because Rafferty failed to exhaust administrative remedies with respect to her Charge of Discrimination filed with the Idaho Human Rights Commission and the EEOC.

In her Response, Rafferty affirms that she does not assert any claims arising out of conduct by JTS or its employees during the time she was previously employed by JTS. Dkt. 66-1, at 5 n. 1. Rafferty concedes that she released such claims via her settlement agreement with JTS, and that she does not seek to revive them in this suit. *Id*. As such, the Court does not further address JTS's arguments regarding claims that accrued during Rafferty's employment, and instead turns to the merits of Rafferty's post-employment claims against JTS.

    a.  <u>Federal and State Post-Employment Retaliation Claims (Counts 1 and 2)</u>

Rafferty alleges that she engaged in protected activity under state and federal law and that JTS subjected her to an adverse employment action by causing her termination from KeyPoint. Dkt. 4, at ¶ 61; *Id*. at ¶ 65. Specifically, Rafferty alleges her activity was protected under state law by the Idaho Human Rights Act, Idaho Code section 67-5901, and under federal law by Title VII of the Civil Rights Act, 42 U.S.C. § 200e–17 and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101–12213.[10]

### i. Retaliation against a former employee

---

[10] The ADAAA was signed into law on September 25, 2008, and took effect on January 1, 2009. *Rohr v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 853 (9th Cir. 2009). The ADAAA amended the Americans with Disabilities Act ("ADA") to "restore into law the intent and protections of the Americans with Disabilities Act of 1990." Pub.L.No. 110-325, 122 Stat. 3553 (2008). The ADAAA rejected the Supreme Court's interpretation of the term "disability" in *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999) and *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and thereby expanded the class of individuals who are entitled to protection under the ADA. *Rohr*, 555 F.3d at 853. Although the ADAAA is applicable to Rafferty's claims, the parties refer to the ADA and the ADAAA interchangeably. For ease of reference, the Court also refers to the ADA, but, to the extent the ADAAA expanded coverage through redefining relevant terms such as "disability," the Court interprets Rafferty's claims under the ADAAA.

JTS first argues Rafferty's retaliation claims must fail because there is no viable disability claim for post-employment actions. In her Amended Complaint, Rafferty alleges that JTS provided derogatory information to KeyPoint about Rafferty's disabilities. Dkt. 4, at ¶ 56 ("On information and belief, JTS or DOE-ID at the urging of JTS, contacted KeyPoint providing derogatory information about Rafferty, including information about alleged disabilities suffered by or perceived to be suffered by Rafferty."). As JTS notes, the Ninth Circuit has held former employees are not "qualified individuals" capable of suing under Title I of the ADA. Dkt. 64-1, at 12 (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1110 (9th Cir. 2000)). In *Weyer*, the Ninth Circuit held that retired or other former workers are not protected by the employment provisions of Title I. *Id.* at 1108–10.

However, as Rafferty explains, Title I of the ADA involves claims for employment discrimination, not retaliation. Dkt. 66-1, at 5. Title I covers claims brought by qualified individuals, defined, in part, as those "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). By contrast, retaliation claims under Title IV of the ADA are not limited to only qualified individuals. Instead, 42 U.S.C. § 12203(a) states, "[n]o person shall discriminate against *any individual* because such individual has opposed any act or practice made unlawful by this chapter or because such individual . . . assisted or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphasis added); *see also Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers*, 268 F.3d 456, 458 (7th Cir. 2001) ("the language of the

Americans with Disabilities Act also supports differentiating retaliation plaintiffs from discriminations plaintiffs.").

In its Reply brief, JTS did not respond to Rafferty's contention that retaliation claims are not limited to qualified individuals. The Court finds Rafferty's claim for retaliation is actionable even though Rafferty is JTS's former employee. As a District Court in North Carolina explained, "[t]he ADA has a separate retaliation provision (42 U.S.C. § 12203) which protects all individuals and not just qualified individuals." *Heston v. Underwriters Laboratories, Inc*., 297 F. Supp. 2d 840, 846 n. 4 (M.D.N.C. 2003).

### ii. Rafferty's retaliation claims

Courts that have considered retaliation claims under the ADA "have almost uniformly adopted the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp*., 411 U.S. 792 (1973)." *Brown v. City of Tucson*, 336 F.3d 1181, 1186 (9th Cir. 2003) (citing cases). Under this framework, a plaintiff must first establish a prima facie case of retaliation. *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1124 n. 16 (9th Cir. 2004). The burden then shifts to the employer to proffer a legitimate reason for its actions. *Id*. "Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "Only then does the case proceed beyond the summary judgment stage."[11] *Id.*

---

[11] Rafferty notes employment discrimination cases allow a plaintiff to either frame their evidence under the burden shifting framework from *McDonnell Douglas* or to eschew this framework and simply introduce "sufficient evidence—direct or circumstantial—of discriminatory intent." Dkt. 66-1, at 4 (citing *Staley v. U.S. Bank N.A*., 2012 WL 3201934, at *4 (D. Idaho Aug. 3, 2012). Because, as discussed below, there is no evidence that JTS retaliated against her, Rafferty's retaliation claim fails under either framework.

To establish a prima facie case of retaliation, a retaliation plaintiff must show: (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the two. *Brown*, 336 F.3d at 1187. Rafferty contends she engaged in a protected activity when "she requested and utilized the accommodation of a modified schedule to deal with her medical issues in 2013 and 2014 while she was employed with JTS." Dkt. 66-1, at 8. Rafferty suggests she suffered an adverse employment action when she was terminated by KeyPoint. *Id.*, at 9. Rafferty claims there was a causal link "between JTS manager Longua's actions in first, engaging in discriminatory conduct against Rafferty while she was at JTS, and then retaliating against her . . . ultimately getting Rafferty terminated from her position with KeyPoint." *Id.*

To establish causation, Rafferty must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [her] firing and that but for such activity [she] would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)[12] (internal citations and quotation marks omitted). JTS argues Rafferty cannot establish the third element of a prima facie retaliation case because there is no evidence of a causal link between any actions taken by JTS and Rafferty's termination from KeyPoint.[13] The Court must agree.

---

[12] Although *Villiarimo* and other cases discussed herein are Title VII cases, not ADA cases, they are relevant to the Court's ADA analysis because the ADA anti-retaliation provision is parallel to the anti-retaliation provision contained in Title VII and cases interpreting the latter provision are frequently relied upon in interpreting the former. *See, e.g., Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) (en banc) ("[W]e join our sister circuits in adopting the Title VII retaliation framework for ADA retaliation claims), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

[13] JTS focuses on the third element of Rafferty's retaliation claim, noting "even if Rafferty can establish involvement in a protected activity by virtue of events that occurred during her employment with JTS and that KeyPoint's termination of Rafferty's employment is an adverse employment action, she still cannot

Rafferty's theory of causation is based on the three phone calls made from Perkins' office to KeyPoint on December 16, 2014. Yet, Rafferty has not offered any evidence—other than her unsubstantiated suspicion—that JTS directed, participated in, or had any knowledge that such calls were made.[14] Rafferty argues her visit to the PERSEC office on December 10, 2014, the escort by Longua on that date,[15] and the three phone calls subsequently made from Perkins' office phone number to KeyPoint on December 16, 2014, suggest a causal link between her protected activity at JTS and her termination from KeyPoint. Dkt. 66-1, at 11. However, during her deposition, Rafferty testified:

> Q.    So, why do you allege the phone calls from the number assigned to Matt Perkins implicates involvement of JTS?
>
> A.    Because a call of the nature of someone trying to do harm to another person would necessitate a private call. To make a private call out of the office, you would want to go to a hard wall office, of which there are only two; one is Matt's and one is Robin Willey's. Matt and [Longua] are very close. You know, [Longua] got his job – got my job I think because, at least in part, from Matt's efforts.
>
>       And I think Kernan could well have made that call. I think it – yeah.
>
> Q.    Made that call from the –
>
> A.    From Matt's office. I think he called from Matt's office and/or was in on the call. Contributed to the call?

---

prove a prima facie case." Dkt. 64-1, at 13. JTS suggests, "[w]here Rafferty's claims break down against JTS is in establishing a causal link between the two." *Id*. The Court agrees and also focuses on the causation element of Rafferty's retaliation claim.

[14] Although Rafferty provides sufficient evidence to show Longua may have discriminated against her while she was an employee of JTS, Dkt. 66-1, at 9–11, Rafferty released such claims against JTS, and there is simply no evidence to connect Longua to actions subsequently taken by KeyPoint.

[15] Rafferty suggests that Longua's escort on December 10, 2014, was suspicious because JTS did not require its employees to escort investigators when she worked there. However, JTS submitted evidence to show that its policy changed prior to Rafferty's December 10, 2014 visit, and that the new policy required JTS employees to escort investigators who visited the PERSEC for file reviews. Dkt. 65-3; Dkt. 70, at ¶¶ 7–9.

Q.    Do you have any proof or other evidence of that? . . . .

A.    Not at this time.

Q.    So, based on the evidence of the phone logs, that's your assumption; correct?

A.    Yes.

Dkt. 65-5, at 145:4–146:6.

Rafferty assumes Longua was somehow involved in the calls from Perkins' office to KeyPoint because Longua testified during his deposition that he had mentioned to Perkins that Rafferty had been in the office on December 10, 2014, and also admitted showing the business card for Rafferty's KeyPoint trainer—Glenn Young—to Perkins. Dkt. 66-1, at 11. However, Longua also testified that he generally told Perkins about, and gave Perkins the business card for, any new investigator who visited the office. Dkt. 66-11, at 90:1–8. Longua contends that he did not say anything negative about Rafferty (or anything other than that she had been in the office) after Rafferty's December 10, 2014 visit to the PERSEC office. Dkt. 70, at ¶ 12. Longua also stated that he did not have any knowledge of any contact between anyone at JTS, or anyone at DOE-ID, and anyone at KeyPoint regarding Rafferty. Dkt. 66-1, at 109:14–21.

Longua further attested in his declaration that he "never contacted or directed anyone else at JTS or DOE-ID to contact KeyPoint or OPM with regard to Rafferty's employment at JTS, any disabilities or with regard to Rafferty's security clearance." Dkt. 70, at ¶ 13. Longua confirmed, "I have no knowledge of any contact between the DOE-ID and OPM or KeyPoint regarding Rafferty. I never contacted KeyPoint, or was involved

[in] any conversation with KeyPoint, regarding Rafferty." *Id*. Although accepting

Longua's contentions—taken alone—may involve a credibility determination, here

Rafferty admitted that she has no evidence to counter Longua's testimony. Dkt. 65-5, at

145:4–146:6.

Perkins' deposition testimony also supports Longua's statements. Specifically,

Perkins testified that DOE-ID protocol required him to keep his office locked when he was

not inside, and that he always kept his office door locked when he was out of the office.

Dkt. 64-3, Ex. G, at 38:20–24. Perkins testified that he did not allow anyone to come in his

office to use his phone to call KeyPoint. *Id*. at 38:25–39:11. Perkins also confirmed that

Longua was never in his office when he made a call to KeyPoint. *Id*. When questioned how

he could know that, Perkins responded: "Because I'm having trouble ever even recalling

making a call to KeyPoint now. I don't recall making one." *Id*. at 39:12–15. Rafferty's

counsel continued:

Q.    So if you don't recall making one, but it could've happened; is that
      right?

A.    Possibly.

Q.    Okay, and is it possible that Kernan Longua was in your office when
      you made that phone call to KeyPoint?

A.    I do not believe so.

Q.    And if you don't have any specific knowledge regarding the phone
      calls that are on this log, how do you know Kernan Longua was not
      in your office when they were made?

A.    Because acting as COR [Contracting Officer Representative] my
      official functions I would never have another contractor on the phone
      call when I was speaking to contract management . . . . unless it was

an open telephonic-type intercom group conversation that we were having. I would never, I would never have any of the contract staff in otherwise.[16]

*Id*. at 39:16–40:9.

Even if Perkins contacted KeyPoint to provide derogatory information about Rafferty, Perkins was an employee of DOE-ID, not JTS. Rafferty thus seeks to hold JTS vicariously liable for alleged actions taken by a DOE-ID employee. However, Rafferty does not allege that DOE-ID or Perkins were an agent of JTS such that JTS could be subject to vicarious liability.

Further, Angela Deabler, KeyPoint's Rule 30(b)(6) designee and the individual who made the decision to terminate Rafferty upon receiving OPM's suspension notice, testified that she was not familiar with anyone named Kernan Longua, Matt Perkins, or Patrick Lashinki. Dkt. 64-2, at ¶ 27; Dkt. 64-3, Ex. B at 98:10–25. Deabler also confirmed she was unaware of any conversation between anyone at KeyPoint and Longua. *Id*.

Moreover, after the Court re-opened discovery following Rafferty's Motion to Compel, Rafferty conducted a second 30(b)(6) deposition of Deabler. In preparation for the second 30(b)(6) deposition, KeyPoint engaged in an extensive search to determine whether anyone affiliated with KeyPoint ever spoke to anyone at JTS or DOE-ID regarding Rafferty. Dkt. 61-1, at 10 n. 11. This search included sending an email to current and former KeyPoint employees to actively solicit any knowledge they may have on this topic. *Id*.

---

[16] Rafferty's supervisor while she worked for JTS, Lashinki, also confirmed that he "never communicated with anyone at DOE-ID about Rafferty's employment at KeyPoint and I certainly never directed anyone at either JTS or DOE-ID to contact KeyPoint or OPM with regard to Rafferty's employment at JTS or with regard to Rafferty's security clearance." Dkt. 64-4, ¶ 8.

After receiving and reviewing such responses, Deabler confirmed that there had not been any communications between any KeyPoint employees and either JTS or DOE-ID about Rafferty. Dkt. 76-1 at 35:1–5 ("All responses indicated there was no communication between KeyPoint and JTS"); *Id*. at 35:6–21 (explaining O'Connor and Hegedus also had no communication with JTS and knew of no one who had any communication with JTS); *Id*. at 70:5–7 ("There's been no communication between KeyPoint's employees and any employees with JTS or DOE regarding the plaintiff.").

After more than four years of litigation, multiple extensions to the discovery deadline, and the Court's order re-opening discovery following Rafferty's successful Motion to Compel, Rafferty has been unable to offer any evidence other than the three phone calls to support the causation element of her retaliation claim. Ultimately, that three calls (lasting less than three minutes combined) were made from Perkins' office to an unidentified individual at KeyPoint does not suggest that such calls had anything to do with Rafferty, let alone that such calls caused Rafferty's termination from KeyPoint.[17]

---

[17] Rafferty argues, under the "cat's paw" approach, an employee can, due to their discriminatory and retaliatory animus, cause another employee's termination without being the actual decisionmaker. Dkt. 66-1, at 8 (citing *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)). Under this theory:

> [I]f a subordinate, in response to plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Id*. Rafferty's "cat's paw" argument is that Longua "set in motion a sequence of events designed to ensure Rafferty would never set foot in the DOE-ID PERSEC office again and no longer be employed by KeyPoint." Dkt. 66-11, at 9. As detailed above, there is simply no evidence to support Rafferty's claim that Longua took any action to ensure she would be terminated by KeyPoint. The cat's paw approach also appears inapplicable because Longua was an employee of JTS, and the only actionable adverse employment action Rafferty complains of concerns the termination of her employment with KeyPoint. Neither Longua nor Perkins were subordinates of KeyPoint.

As JTS notes, Rafferty also has the burden of showing that a retaliatory purpose was the but-for cause of KeyPoint's decision to terminate Rafferty's employment. The Supreme Court has held the standard for the "causal link" in retaliation claims is but-for causation, and the Ninth Circuit has adopted this more stringent test for retaliation claims under the ADA. *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472–73 (9th Cir. 2015) (applying the *Nassar* but-for causation standard at the summary judgment phase to a claim alleging retaliation in violation of the ADA). Under this standard, Rafferty must show that her protected activity was the but-for cause of KeyPoint's decision to terminate her employment. *Id*. at 473. Here, not only is there no evidence that JTS communicated negative information about Rafferty to KeyPoint, there is also no evidence that KeyPoint would not have terminated Rafferty but for her protected activity while working for JTS. *Id*. (finding summary judgment was appropriate on ADA retaliation claim where there was no evidence that school district's adverse actions were connected to plaintiff's protected activity).

Rafferty argues the calls are sufficient to withstand summary judgment because there was no business reason for DOE-ID to contact KeyPoint, and because neither JTS nor KeyPoint have been able to provide any explanation for the three calls. Dkt. 66-1, at 11. Rafferty notes, "JTS has made no effort to provide any legitimate, non-retaliatory reason, or any reason at all for the calls made from PERSEC. JTS has not met its burden to provide a legitimate, non-retaliatory reason for the three calls from PERSEC to KeyPoint on December 16, 2014[.]" *Id*. at 12. However, because Rafferty has not shown a causal

link between her protected activity and her termination from KeyPoint, the burden has not shifted to JTS to provide a legitimate, non-retaliatory reason for the calls. Rafferty's inability to set forth a prima face case of retaliation means JTS does not have the burden of articulating a legitimate, non-retaliatory reason for the calls. *See, e.g., Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (explaining *if* the plaintiff succeeds in showing a prima facie case, *then* the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection.") (internal quotation marks omitted); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) ("Once a prima face case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons."); *Brooks*, 229 F.3d at 928 (noting the burden of production to establish legitimate reasons for an adverse employment action shifts to the employer *after* a plaintiff sets forth a prima facie case of retaliation). Moreover, JTS cannot provide a legitimate, non-retaliatory reason for the phone calls when all of the evidence suggests JTS not only did not participate in the calls, but also had no knowledge such calls were even made. See, e.g., Dkt. 64-2, at ¶¶ 25–28.

The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* (quoting Fed. R. Civ. P. 56). Because

Rafferty has not presented evidence to demonstrate a causal link between her protected activity and termination by KeyPoint, her retaliation claims cannot survive summary judgment. *McGinest*, 360 F.3d at 1124 (affirming summary judgment where plaintiff had not presented sufficient evidence to demonstrate a causal link between his protected activity and defendant's adverse employment action). [18]

      b.  <u>Intentional Interference with Prospective Economic Advantage (Count 3)</u>

Rafferty and JTS agree the elements of a claim for intentional interference with a prospective economic advantage are: (1) the existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself; and (5) resulting damage to the plaintiff whose expectancy was disrupted. Dkt. 64-1, at 19; Dkt. 66-1, at 13 (both citing *Highland Enterprises, Inc. v. Barker*, 986 P.2d 996, 1004 (Idaho 1999)).

JTS disputes Rafferty's ability to meet the third element because there is no evidence that any JTS employees had any contact with KeyPoint about Rafferty. Rafferty contends there is evidence of intentional interference because Longua purportedly induced the termination of her employment with KeyPoint by obtaining contact information for

---

[18] As mentioned, Rafferty asserts claims for retaliation under both federal law and the Idaho Human Rights Act. Because the same standards apply under the ADA and the Idaho Human Rights Act, the Court only references the federal law. *Harris v. Treasure Canyon Calcuim Company*, 132 F. Supp. 3d 1228, 1236 n. 2 (D. Idaho 2015); *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979) (adopting the standards promulgated in federal discrimination cases for purposes of analyzing claims brought under the Idaho Human Rights Act); *Foster v. Shore Club Lodge, Inc*., 908 P.2d 1228, 1232–33 (Idaho 1995) (holding the Idaho Human Rights Act is to be interpreted consonant with the ADA). Rafferty's inability to show a prima facie case of retaliation under federal law is accordingly fatal to her state law retaliation claim as well. *Harris*, 132 F. Supp. 3d at 1238.

Rafferty's KeyPoint trainer, giving this information to Perkins, and because the three phone calls to KeyPoint were made from Perkins' office three days later. Dkt. 66-1, at 13. As explained above, Longua routinely obtained contact information for new investigators and told Perkins when outside investigators were in the PERSEC. Dkt. 66-11, at 90:1–8. Rafferty's assumption that such conduct was nefarious is undermined by such testimony. There is also no evidence that Longua had any connection to the three phone calls made to KeyPoint. Nor is there any evidence to show that the phone calls either had anything to do with Rafferty, or that they induced the termination of her employment with KeyPoint.

In sum, there is simply no evidence to suggest Longua or JTS intentionally interfered with, or induced the termination of, Rafferty's employment with KeyPoint. While the Court understands Rafferty's suspicion given the contentious history of her relationship with Longua and Perkins, and the three phone calls, "suspicion of improper motives, unsupported by stronger evidence, is insufficient to raise an issue of fact." *Moore v. Home Ins. Co*., 601 F.2d 1072, 1075 (9th Cir. 1979). Further, "[u]nder the liberal discovery rules of the Federal Rules of Civil Procedure," and particularly in light of the extensive and extended discovery permitted in this case, the Court "must assume that if firmer evidence existed, [Rafferty] would have discovered it." *Id*.

   c.   <u>Negligent and Intentional Infliction of Emotional Distress (Counts 4 and 5)</u>

The parties agree a claim for negligent infliction of emotional distress ("NIED") under Idaho law requires a plaintiff to prove: (1) a legal duty recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; (4) actual loss or damage; and (5) a physical manifestation of the

plaintiff's injury. Dkt. 64-1, at 19; Dkt. 66-1, at 14 (both citing *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013)).

The parties similarly agree the elements of a claim for intentional infliction of emotional distress ("IIED") under Idaho law are: (1) the conduct in question is intentional or reckless; (2) the conduct is extreme and outrageous; (3) a causal connection between the wrongful conduct and emotional distress; and (4) the emotional distress is severe. Dkt. 64-1, at 19; Dkt. 66-1, at 14 (both citing *Edmondson v. Shearer Lumber Prod.*, 75 P.3d 733 (Idaho 2003)).

Like her other claims against JTS, Rafferty's NIED and IIED claims fail because she cannot establish a causal link between conduct by JTS and her injury.  Rafferty argues she can establish causation because she "does have evidence that Longua, a JTS employee, communicated with, at a minimum, DOE-ID regarding Rafferty's employment with KeyPoint. Longua admitted he took Young's business card to Perkins and told him Rafferty had been present in the PERSEC facility."  Dkt. 66-1, at 15. Rafferty also notes "neither JTS nor KeyPoint has provided any explanation for the calls which occurred between PERSEC and Keypoint." *Id*.

Such allegations illustrate Rafferty's NIED and IIED claims fail to survive summary judgment on several elements, in addition to causation. First, as mentioned, telling Perkins about Rafferty and Young's visit was Longua's common practice and, even if it wasn't his usual practice, Longua did not breach a legal duty or act in an intentional, extreme, or outrageous manner by informing Perkins about Rafferty and Young's presence. As such, Rafferty cannot meet the second element of either her IIED or NIED claim.

Second, there is no evidence to connect any actions by JTS to Rafferty's emotional distress. As detailed above, and as confirmed by Perkins and Deabler, Longua "never contacted or directed anyone else at JTS or DOE-ID to contact KeyPoint or OPM with regard to Rafferty's employment at JTS, any disabilities or with regard to Rafferty's security clearance." Dkt. 70, at ¶ 13. Longua confirmed, "I have no knowledge of any contact between the DOE-ID and OPM or KeyPoint regarding Rafferty. I never contacted KeyPoint or was involved [in] any conversation with KeyPoint, regarding Rafferty." *Id.*; *see also* Dkt. 64-3, Ex. G, at 39:16–40:9; Dkt. 62, at 35:4–36:8; 37:10–18; 70:5–7. Rafferty has admitted she only has her suspicion—and not evidence—to counter such testimony. Dkt. 65-5, at 145:4–146:6.

Third, and once again, the three phone calls, standing alone, are not alone sufficient to establish causation. The phone calls potentially connect Perkins and/or DOE-ID to KeyPoint, but do not connect Longua or JTS to KeyPoint. Nor is there evidence that the phone calls involved Rafferty. Moreover, there is also no evidence that the phone calls caused KeyPoint's termination of Rafferty, and, as explained below, the evidence in the record instead illustrates Rafferty's termination was caused by independent actions taken by OPM.

Finally, witnesses for both JTS and KeyPoint verified that they had no knowledge of any contact between the DOE-ID and KeyPoint regarding Rafferty. Not to belabor the point, but Longua confirmed he never contacted KeyPoint, was never contacted by KeyPoint, and never directed anyone else at JTS or DOE-ID to contact KeyPoint, regarding Rafferty. Dkt. 70, at ¶¶ 13–14. Lashinki attested, "I never communicated with anyone at

DOE-ID about Rafferty's employment at KeyPoint and I certainly never directed anyone at either JTS or DOE-ID to contact KeyPoint or OPM with regard to Rafferty's employment at JTS[.]" Dkt. 64-4, at ¶ 8. After actively soliciting information from its employees regarding whether there had been any communications between anyone from JTS and anyone from KeyPoint regarding Rafferty, KeyPoint's Deabler confirmed "[a]ll responses indicated there was no communication between KeyPoint and JTS." Dkt. 76-1 at 35:4–36:8; 37:10–18; 70:5–7.

For the aforementioned reasons, Rafferty's NIED and IIED claims do not survive summary judgment. Having addressed her claims against JTS and finding Rafferty lacks evidence to establish the causation element of each claim, summary judgment is appropriately entered in favor of JTS.

3. *KeyPoint's Motion for Summary Judgment (Dkt. 61)*

Rafferty's claims against KeyPoint are for discrimination under the ADA and Idaho Human Rights Act on the basis of both a perceived and actual disability. As mentioned, courts interpret the standards for disability under the ADA and the Idaho Human Rights Act identically. *Foster*, 908 P.2d at 1232–33. Accordingly, when the Court refers to one statute, its reference impliedly includes the other.

Like Rafferty's retaliation claim against JTS, the Court considers her disability discrimination claim against KeyPoint under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas*, 411 U.S. at 802–806; *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) ("Under the ADA, when an employee establishes a prima facie case of discrimination because of a disability, and the employer provides a

non-discriminatory reason for that discharge . . . the analysis developed in *McDonnell Douglas* for suits under Title VII of the Civil Rights Act of 1964 applies."). Again, under this framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination. *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. "If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Id*.

      a.   <u>Disability Discrimination (Counts 6, 7, 8, and 9)</u>

A prima facie case of disability discrimination requires a plaintiff to establish that: (1) she is "disabled" within the meaning of the statute; (2) she is a "qualified individual" (that is, she is able to perform the essential functions of her job, with or without reasonable accommodations); and (3) she suffered an adverse employment action "on the basis of her disability." 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."). KeyPoint suggests Rafferty cannot establish each of the three elements of a prima facie disability claim.

      **i. Actual Disability**

Rafferty alleges she meets the definition of a person with a disability and contends that she is actually disabled. *See* 42 U.S.C. § 12102(1)(A) (defining a person with a disability as someone with "a physical or mental impairment that substantially limits one

or more of the major life activities of such an individual.") Rafferty identifies her actual disability as severe insulin resistance, depression, and sleep apnea, and suggests such disabilities substantially limited her major life activities, including her ability to focus, concentrate, sleep, and work. Dkt. 4, at ¶¶ 93–94. Under the applicable regulations, "major life activities" include thinking, concentrating, sleeping, and working. 29 C.F.R. § 1630.2(i)(1)(i).

KeyPoint argues Rafferty "has no facts suggesting she was in fact limited in performing her job duties in any way because of her disability[.]" Dkt. 61-2, at 15. The 2008 amendments to the ADA relaxed the standard for determining whether a plaintiff is substantially limited in engaging in a major life activity. The term "substantially limits" is "to be construed broadly in favor of expansive coverage," and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). However, even under this low standard, an impairment must substantially limit the ability of an individual "to perform a major life activity as compared to most people in the general population." *Id*. at (j)(1)(ii). Here, there is no evidence—beyond the bare allegations in Rafferty's Amended Complaint—that her disabilities limited her major life activities as compared to "most people in the general population." *Id*.

To the contrary, although Rafferty testified that she experienced significant health issues as a result of her severe insulin resistance when working for JTS in 2013, she also clarified that such issues largely resolved once she received treatment. Dkt. 66-15, at 91:1–92:19. Rafferty confirmed she was still being seen for depression when she applied for her position with KeyPoint, but also testified that she did not consider herself to have a

disability at the time. Dkt. 76-2, at 187:17–24; 190:11–15. Rafferty does not identify any way her depression substantially limited her major life activities. Further, Rafferty testified that her training with KeyPoint "went along very well," and that she was "given a rating of 4.5 out of 5, 5 being the highest . . . of grasping the training." Dkt. 66-15, at 114:15–19. Rafferty worked full time while training with KeyPoint, and nowhere suggests she had any trouble keeping up with this schedule as a result of her disability, nor with accomplishing any other major life activities. *Id*. at 115:1–21. In fact, the record is devoid of any testimony or evidence to suggest Rafferty had trouble focusing, concentrating, sleeping, or working after she was treated for insulin resistance in 2013. *See generally*, Dkt. 66-15; Dkt. 66-18; Dkt. 66-24; Dkt. 76-2.

Because there is no evidence that Rafferty's disabilities substantially limited her major life activities after she received treatment in 2013, a jury could not reasonably conclude that Rafferty had an actual disability under the ADA. *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1112 (9th Cir. 2014) (holding district court erred in denying defendant's motion for summary judgment where record did not contain evidence that plaintiff was limited in his major life activities compared to most people in the general population). Counts 8 and 9 accordingly fail as a matter of law.

### ii. Perceived Disability/Causation

Rafferty also alleges KeyPoint perceived and regarded her as being disabled and treated her "as if she was unable to perform her position due to derogatory information provided by JTS as to Rafferty's perceived disability, including alleged mental health issues." Dkt. 4, at ¶¶ 83, 86, 89. An individual can establish disability discrimination on

the basis of a perceived disability if he or she is subjected to discrimination on the basis of a perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. 29 C.F.R. § 1630.2(l)(1); *Rorh v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 853 (9th Cir. 2009) (explaining the ADAAA clarified that employers need not regard someone as being substantially limited in any major life activity to regard them as disabled, "thereby expand[ing] the class of individuals who are entitled to protection under the ADA.")

However, "[e]stablishing that an individual is 'regarded as having such an impairment' does not, by itself, establish liability." 29 C.F.R. § 1630.2(2)(l)(1). Liability is established only if the plaintiff can show that the employer discriminated against the plaintiff on the basis of the perceived disability. *Id*. at (l)(3). The issues regarding whether KeyPoint perceived Rafferty to be disabled, and whether it terminated her as a result, overlap and are accordingly discussed together, although they represent two elements of a prima facie case of disability discrimination.

KeyPoint argues Rafferty cannot show KeyPoint perceived her to be disabled because there is no evidence KeyPoint had any knowledge of Rafferty's alleged disability—whether actual or perceived. Dkt. 61-2, at 15. Specifically, Rafferty admitted that she never told anyone at KeyPoint that she had a disability. Dkt. 76-2, at 187:10–14. Rafferty also admitted she did not have any firsthand or even secondhand information to suggest anyone else had ever informed KeyPoint about her disability. *Id*. at 188:1–189:15.

In addition, as part of her onboarding paperwork with KeyPoint, Rafferty filled out a form that asked if she considered herself to have a disability, so that KeyPoint could

determine whether it should provide her with a reasonable accommodation. Dkt. 61-1, at ¶ 39; Dkt. 76-2, at 187:15–24; 190:6–10. Rafferty indicated on the form that she did not have a disability and, as noted, explained she did so because she "did not consider [her]self to have a disability at that time." *Id*. at 187:15–20. During her deposition, Rafferty also stated that her only evidence that KeyPoint regarded her as disabled was her "belief of having dealt with retaliation through JTS that I believe was fed forward to KeyPoint in some form, in some way." *Id*. at 188:23–189:4. However, Rafferty admitted that she did have any first or secondhand knowledge that such information was actually fed forward by JTS to KeyPoint. *Id*. at 189:5–8. Further, as the Court has already explained in detail, there is no evidence that JTS had any communication with KeyPoint about Rafferty or her disability.

However, on summary judgment, Rafferty argues KeyPoint has admitted that Rafferty was terminated after "significant issues developed on SF86." Dkt. 66, at 6. Rafferty notes her SF-86 specifically identified her mental health treatment and suggests this was the only information KeyPoint did not already have when it hired her. *Id*. at 14; Dkt. 66-18, at ¶ 10. For two reasons, Rafferty argues KeyPoint must have improperly accessed her SF-86,  perceived her to be disabled, and terminated her as a result.

First, Rafferty suggests KeyPoint's contract with OPM requires that it "shall adhere to the requirements established in the National Industrial Security Program Operating Manual" ("NISPOM") and appoint a Facility Security Officer ("FSO") to "supervise and direct security measures necessary for implementing applicable requirements of the manual and related Federal requirements for classified information." Dkt. 66, 12–13; Dkt. 66-6; Dkt. 66-7. Rafferty argues that, pursuant to NISPOM, KeyPoint's FSO was required to

review her SF-86 for completeness but was prohibited from disclosing information from it to the employer.[19] Rafferty notes that KeyPoint's FSO, Danon Hargadin, was never identified as a witness by KeyPoint. Dkt. 66-24, at ¶ 8. Rafferty implies that Hargadin (or his designee) must have reviewed her SF-86 and impermissibly disclosed her mental health information to others at KeyPoint. Dkt. 66, at 14.

Rafferty's contention is not supported by the record. The contract to which Rafferty cites in support of her contention that KeyPoint's FSO was required to review her SF-86 is a modification of KeyPoint's contract with OPM that did not become effective until December 2017—three years after Rafferty was terminated by KeyPoint. Dkt. 66-6, at 1. KeyPoint further explains that the NISPOM contains procedures promulgated by the U.S. Department of Defense for programs and agencies under its control pursuant to Executive Order 12869 of January 6, 1993. Dkt. 72-3, at ¶ 6. KeyPoint notes that the agencies affected by Executive Order 12869 have discretion whether or not to incorporate all or portions of

---

[19] Specifically, NISPOM section 2-202 "Procedures for Completing Electronic Version of the SF 86," provides:

> The electronic version of the SF86 shall be completed jointly by the employee and the FSO or an equivalent contractor employee(s) who has (have) been specifically designated by the contractor to review an employee's SF 86.

> a.   The FSO or designee shall inform the employee that the SF 86 is subject to review and shall review the application solely to determine its adequacy and to ensure that necessary information has not been omitted. The FSO or designee shall provide the employee with written notification that review of the information is for adequacy and completeness, information will be used for no other purpose within the company, and that the information provided by the employee is protected by . . . [5 U.S.C. § 552a, Privacy Act]. The FSO or designee shall not share information from the employee's SF 86 within the company and shall not use the information for any purpose other than determining the adequacy and completeness of the SF 86.

Dkt. 66-24, at ¶¶ 10–11; Dkt. 66-7.

the NISPOM procedures. Dkt. 72-3, at ¶¶ 6–7. In 2014, KeyPoint used this discretion to prescribe its own procedures with regard to the handling of SF-86 forms. *Id*. Specifically, KeyPoint required employees to submit an SF-86 directly to OPM, without review by KeyPoint's FSO or others. *Id*. at ¶¶ 5, 7.

The record supports KeyPoint's position, as Rafferty testified that she received an email with information on how to submit the SF-86 electronically to OPM—not to KeyPoint. Dkt. 65-5, at 104:4–5; 128:9–11. KeyPoint's security specialist (who was also responsible for communicating and coordinating access with OPM) Maureen O'Connor also testified that, to submit an SF-86, an employee would transmit the form electronically directly to OPM. Dkt. 75-1, at 33:11–24. O'Connor confirmed that she never, at any point, had access to employees' SF-86 documentation. *Id*. at 5–10.

Deabler also explained that neither KeyPoint, nor its FSO, has any access to KeyPoint employees' SF-86 forms:

> Q. So does KeyPoint have a personnel security specialist or other officer or employee who's responsible for KeyPoint employees' SF-86 paperwork, who, you know, ensures that the paperwork is completely filled out before it gets submitted to OPM?
>
> A. We do not see the paperwork
>
> Q. So there's no one who's doing quality control before the SF-86 and the other security clearance docs go to OPM?
>
> A. No.
>
> Q. Who is it who's in charge of gathering up that paperwork to submit to OPM?

A. We do not ever physically touch the paperwork prior to going to OPM, it's an electronic system. Our security specialists make the request for that to go to subjects of investigation. . . .

Q. Okay. So when you say [the security specialist] makes a request for the documents to go to OPM, what does that process entail? . . . .

A. They simply request that OPM make available the link for that person to fill out their paperwork.

Q. Okay. And what was the process in the fall, and I guess into winter, of 2014?

A. It was the same.

Q. Okay. So, basically you're saying – so there's a link that gets sent out? Is it via e-mail?

A. Yes.

Q. So are the SF-86 applications of KeyPoint employees ever shared or disclosed to other KeyPoint employees?

A. No.

Q. Are there any circumstances under which that would ever occur?

A. Only if the employee themselves disclosed their SF-86 information to another person.[20]

Q. Are you aware of that happening at all?

A. No.

Q. When employees fill out an SF-86 electronically, is it kept anywhere on their computer or on a KeyPoint server?

---

[20] Deabler clarified that it is possible that someone from KeyPoint might perform a background investigation on a former KeyPoint employee, but only if the individual being investigated had separated from his or her relationship with KeyPoint and was working for a new company with whom KeyPoint had a contract. *Id*. at 50:14-21. This exception does not apply to Rafferty, as she was a KeyPoint employee at the time she alleges KeyPoint inappropriately viewed her SF-86.

A. It is not kept on a KeyPoint server. And only if the employee decides to keep a copy for themselves.

Dkt. 75-2, at 46:11–48:24.

Deabler further testified that KeyPoint cannot access SF-86 forms submitted by KeyPoint employees. *Id*. at 51:1–19. Deabler stated it is not possible for any KeyPoint investigator to access another current or potential KeyPoint investigator's SF-86. *Id*. at 50:22–53:1. Simply put, the evidence—including Rafferty's own testimony—contradicts Rafferty's contention that KeyPoint's FSO, his designee, or any other KeyPoint employee either viewed or improperly disclosed information on her SF-86.

Second, Rafferty argues KeyPoint must have accessed her SF-86 because of Michael Hegedus's email noting "12/18/14 OPM suspended access due to significant issues developed on SF86 since previous PR." Dkt. 66-9. Rafferty suggests, "KeyPoint's admission that it had knowledge of information on Rafferty's [SF-86] and the RSI demonstrates it had knowledge of her disability." Dkt. 66, at 14.

Rafferty further contends the egregious way KeyPoint handled the Hegedus email during discovery also illustrates that KeyPoint must have improperly accessed her SF-86 and used information disclosed therein against her. As mentioned, KeyPoint's response to Rafferty's Charge of Discrimination filed with the U.S. Equal Employment Opportunity Commission ("EEOC Charge") stated "OPM suspended Ms. Rafferty's clearance and access due to 'significant issues developed on SF86' since her previous periodic review of her clearance." Dkt. 66-8, at 2–3.

Although the "significant issues developed on SF86" was a quote from Hegedus's email, KeyPoint hid Hegedus's email throughout most of the discovery period, claiming the source of the quote was privileged. Dkt. 66, at 14. After Rafferty challenged the privilege claim, KeyPoint suggested during a discovery dispute conference with the Court that the quoted language was from a telephone call. *Id*. Later, KeyPoint claimed the use of quotes was nothing more than a "stylistic choice" by the attorney who drafted KeyPoint's response to Rafferty's EEOC Charge. *Id*. After the Court denied KeyPoint's privilege claim and compelled it to produce Hegedus's email, Hegedus submitted a declaration stating he had no memory of what he did to investigate Rafferty's EEOC Charge, including where the "significant issues" language came from. *Id*. Rafferty argues "KeyPoint's efforts to hide the information, even to the point of counsel claiming the quote was a stylistic choice, demonstrate KeyPoint used the disclosed information against Rafferty and did not want that disclosed." *Id*. at 15.

Keypoint counters that Hegedus was tasked with investigating the circumstances of Rafferty's termination ten months after she was terminated, in response to Rafferty's EEOC Charge. After conducting his investigation, Hegedus informed his colleagues via email—on or about October 14, 2015—that OPM suspended Rafferty's access due to "significant issues developed on SF86." Dkt. 66-9. KeyPoint underscores that there is no evidence to suggest that Hegedus—or anyone at KeyPoint—had information regarding Rafferty's SF-86 ten months earlier when she was terminated. KeyPoint also contends that nothing in the record explains how Hegedus obtained information about why OPM suspended Rafferty's access to its contract. Although the Court reopened discovery after

Hegedus's email was produced, KeyPoint notes Rafferty chose not to depose Hegedus to inquire further about how he learned "significant issues" developed on her SF-86. Thus, KeyPoint argues Rafferty does not have any evidence that Hegedus improperly accessed her SF-86 at any time, let alone prior to her termination.

The Court agrees with Rafferty that KeyPoint's conduct during discovery is suspicious. Again, however, suspicion alone is insufficient to raise an issue of fact. *Moore*, 601 F.2d at 1075. Ultimately, there is simply no evidence to tie any actions taken by Hegedus when investigating Rafferty's EEOC Charge in 2015, to KeyPoint's decision to terminate Rafferty almost a year earlier, in December, 2014. Instead, it is undisputed that Deabler had the sole responsibility for deciding to terminate Rafferty's employment in 2014. Dkt. 75-2, at 83:13–19; *see generally* Dkt. 66-24. Deabler had never met Rafferty and was only tangentially familiar with her name because Rafferty was a KeyPoint trainee. Dkt. 75-2, at 52:1–9. When Deabler received notice that Rafferty's access to OPM's contract had been suspended on December 18, 2014, she sent an email two hours later directing the termination of Rafferty's employment. Dkt. 61-14.

Deabler testified that she made the decision to terminate Rafferty solely based on OPM's suspension of Rafferty's access to OPM's contract. Dkt. 75-2, at 83:16–25 ("because she was not able to perform work on the contract, we terminated her employment."); *Id*. at 95:14–16 ("She could not perform her work duties that we hired her to do in a suspended status so we moved to terminate."). There is no evidence that Deabler accessed Rafferty's SF-86, regarded Rafferty as disabled, or had any perception whatsoever that Rafferty had a disability. As such, Rafferty's perceived disability claims

fail as a matter of law. *Davis v. Con-Way Freight, Inc.*, 715 Fed. Appx. 805, 806 (9th Cir. 2018) (explaining absent evidence that his employer were aware he was disabled, the plaintiff could not show that he suffered an adverse employment action on the basis of disability); *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) ("Our analysis begins and ends with [plaintiff's] prima facie case, as he fails to make one.").

### iii. **Qualified Individual**

Finally, even if there was evidence to suggest KeyPoint perceived Rafferty to be disabled, KeyPoint argues Rafferty fails to establish a prima facie case of disability discrimination because she was not a qualified individual. Dkt. 61-2, at 12–14. KeyPoint argues Rafferty was no longer a "qualified individual" once the OPM suspended her access to its contract.

"The plain language of the [ADA] . . . allows only those who are 'qualified individuals' to bring suit." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir. 2000) To be a "qualified individual" under the ADA, a disabled person generally must be able to perform the "essential functions" of his or her job "with or without accommodation."[21] 42 U.S.C. § 12111(8). In a "perceived" or "regarded as" case, however, the plaintiff must show an ability to perform the essential functions *without* reasonable accommodation. *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232-33 (9th Cir. 2003) (holding as a matter of first impression that "there is no duty to accommodate an employee in an 'as regarded' case" and thus the employee must be able to perform the

---

[21] The term "reasonable accommodation" may include making facilities accessible to individuals with disabilities, adjusting work policies, or reassignment to vacant positions. 42 U.S.C. § 12111(9).

essential functions without accommodation); *see also Taylor v. Health*, 675 F. App'x 676, 677 (9th Cir. 2017) ("To satisfy the 'qualified individual' prong in a 'regarded as' disabled case, Taylor must make a prima facie showing that she was able to perform the essential functions of the job without accommodation.").

Accordingly, Rafferty carries the initial burden of establishing that she is a qualified individual as part of her prima facie disability discrimination case. *Hutton v. Elf Atochem N. Am., Inc.,* 273 F.3d 884, 892 (9th Cir. 2001); *see also Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 988 (9th Cir. 2007) (en banc) ("[U]nder the ADA, an employee bears the ultimate burden of proving that [she] is ... a qualified individual with a disability ...." (internal quotation marks omitted)). Further, Rafferty "must show she was qualified at the time of the adverse employment action, rather than at some earlier or later time." *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1129 (9th Cir. 2020).

KeyPoint suggests Rafferty was not a qualified individual as soon as OPM suspended her access to its contract, since access to OPM's contract was an essential requirement of her position. Dkt. 61-2, at 14; Dkt. 61-1, at ¶¶ 4, 31. Deabler testified that each of Rafferty's job duties for KeyPoint required access to the OPM contract, and that Rafferty could not perform any aspects of her investigator position without access to OPM's contract. Dkt. 75-2, at 83:16–25; 90:21–91:15; 95:8–16.

As KeyPoint notes, numerous cases illustrate that when a clearance or license is an essential requirement of the position, a plaintiff must possess such clearance or license to be a "qualified individual" under the ADA. *Johnson v. Board of Trustees of Boundary Sch. Dist. No. 101*, 666 F.3d 561, 564 (9th Cir. 2011) (affirming summary judgment in favor of

defendant school district where plaintiff did not satisfy the job prerequisites because her teaching certificate had expired, and she thus was not a qualified individual within the meaning of the ADA); *Bates*, 511 F.3d at 994 (explaining class members had to show they met the basic qualifications for the package-car driver position, including holding a valid driver's license, to be "qualified individuals" for the position); *Anthony*, 955 F.3d at 1134 (affirming District Court's determination that plaintiff was not a "qualified individual" for technical writer job where she did not possess bachelor's degree prerequisite for the position). KeyPoint argues that because Rafferty was unable to perform her job when OPM suspended her access to its contract, she was no longer a "qualified individual" when KeyPoint terminated her and thus fails to state a prima facie case of disability discrimination.

Rafferty counters that access to the OPM contract was not a true requirement of the job, noting KeyPoint placed five other individuals on leave, rather than terminating them, while their access to OPM's contract was further adjudicated. Dkt. 66, at 10–12. However, Deabler testified in her deposition that three of the five individuals Rafferty identifies— M.S., D.S., and N.U.—were never hired by KeyPoint, but were instead being considered for employment at the time their access to OPM's contract was suspended.[22] Dkt. 66-14 at 157:9–161:13; 186:2–188:19; Dkt. 72-1, at 198:12–18; 201:11–202:4. Although KeyPoint continued to consider such individuals as candidates for employment while their access was suspended, it did not hire such individuals as employees, and also obviously could not

---

[22] The Court uses initials to identify the individuals Rafferty references in order to protect their privacy.

terminate them. As KeyPoint notes, the fact that it did not employ these individuals while OPM disallowed them access to its contract actually supports KeyPoint's position that access to OPM's contract was a job requirement. Dkt. 72, at 3. The fourth individual Rafferty identifies, C.R., was an independent contractor, and was also not a KeyPoint employee. Dkt. 66, at 11. Deabler testified that, like the other three individuals Rafferty identified, C.R. did not actually work for KeyPoint, but was instead an independent contractor who was being considered as a candidate for employment with KeyPoint at the time OPM suspended her access to its contract. *See, e.g.*, Dkt. 66-14, at 175:7–177:23. C.R. was not a KeyPoint employee. *Id*. Four of the five individuals Rafferty identifies were never employed by KeyPoint, and thus do not support Rafferty's position that access to OPM's contract was not a true job requirement.

The final individual Rafferty identifies, "Kamran," was a KeyPoint employee who performed work for KeyPoint. Dkt. 72-1, at 199:8–200:8. Unlike Rafferty, who was in training when her access was suspended, Kamran was a KeyPoint employee who was actively working in the field. Kamran had access to OPM's contract when he started working in the field, but such access was suspended as a result of an "integrity audit," which suggested his work performance on the OPM contract was deficient. Dkt. 72, at 4. Although Kamran was placed on an unpaid leave of absence while that audit was conducted, he never performed work for KeyPoint once OPM suspended his access to work on the contract, and he was ultimately terminated. Dkt. 72-4, at ¶ 6 ("Kamran was on unpaid suspension as of, and his last day worked was, November 7, 2014 which was the day that OPM suspended his work to work on the contract. He did not work on the contract after

that date."). Similarly, Rafferty had access to OPM's contract when she started training with KeyPoint and was allowed to perform investigative work during this time period. Like Kamran, as soon as her access to OPM's contract was suspended, she could no longer perform any work for KeyPoint. Thus, that Kamran did not perform any work for KeyPoint once his access was suspended again supports KeyPoint's claim that access to OPM's contract was a job requirement.

The five individuals Rafferty references support KeyPoint's position that access to OPM's contract was a prerequisite of the investigator position. As such, KeyPoint was not obligated to place Rafferty on unpaid leave while her access to OPM's contract was adjudicated. "[U]nless a disabled individual independently satisfies the job prerequisites, she is not 'otherwise qualified,' and the employer is not obligated to furnish any reasonable accommodation." *Johnson*, 666 F.3d at 565–66; *Anthony*, 955 F.3d at 1134 (explaining the court need not consider reasonable accommodation in determining whether an employee satisfied the job prerequisites). Moreover, because, as the Court has explained above, Rafferty can only bring claims for a "perceived disability," KeyPoint was not obligated to put her on an unpaid leave of absence while her access was adjudicated in order to comply with the ADA. *Kaplan*, 323 F.3d at 1232–33 ("[T]here is no duty to accommodate an employee in an 'as regarded' case" and thus the employee must be able to perform the essential functions without accommodation.").

Rafferty argues alternatively that even if OPM contract access was a job requirement, she only lost her access to OPM's contract because KeyPoint wrongfully suspended her employment, causing OPM to then suspend her access to its contract. Dkt.

66, at 7–9. Other than inadmissible hearsay, there is nothing in the record to support this contention. By contrast, Deabler testified unequivocally that OPM suspended Rafferty's access to its contract, and that KeyPoint cannot determine whether individuals have access to OPM's contract. Dkt. 75-2, at 70:22–72:1. Deabler explained OPM suspended Rafferty's access, and KeyPoint then terminated Rafferty "because she was not able to perform work on the contract." *Id*. at 83:16–25; 91:13–15 ("When we were notified by OPM that she was suspended, she was not able to work on the OPM contract."); *Id*. at 147:4–7 "(KeyPoint did not suspend Rafferty."); *Id*. at 147:18–24 ("We would never – we cannot suspend a subject's clearance. . . we do not have that authority to suspend somebody's clearance . . . OPM make[s] the determination if somebody's clearance [is] suspended.").

In addition, on December 18, 2014, OPM informed KeyPoint through a PIPS mail message that OPM had suspended Rafferty's access to work on its contract. Specifically, Pamela Hindman at OPM sent KeyPoint a message with the subject, "SUSPEND – RAFFERTY." The body of the message stated, "THE FOLLOWING INDIVIDUAL HAS BEEN SUSPENDED, PLEASE CANCEL PIPS ACCESS AND THEIR FACILITY ACCESS HAS BEEN RESCINDED." Dkt. 61-9, at 4. Below the message was the name "RAFFERTY, CONSTANCE RENE." *Id*.; *see also* Dkt. 75-2, at 144:9–13. There is no evidence in the record to suggest KeyPoint suspended Rafferty before it received this communication from OPM.

Finally, OPM itself sent Rafferty a letter verifying that it was the entity that suspended her access to its contract. Dkt. 61-13. In response to Rafferty's request for any and all information pertaining to her RSI, OPM responded: "The Office of Personnel

Management (OPM) suspended Ms. Rafferty's access, as part of the adjudicative process, pending the outcome of her scheduled RSI. On December 22, 2014, KeyPoint Government Solutions notified OPM that they had terminated her employment so all work on the RSI was discontinued." *Id*. Rafferty's contention that OPM "denied it had taken any action to suspend Rafferty" is based on inadmissible hearsay and, in any event, is contradicted by OPM's explicit written acknowledgement that it was responsible for suspending Rafferty's access to its contract. *Compare* Dkt. 66, at 8 *with* Dkt. 61-13.

In sum, because Rafferty was not a "qualified individual" once OPM suspended her access to its contract, her disability discrimination claims fail as a matter of law.

### iv. **Attorneys' Fees**

KeyPoint contends, without any legal authority or analysis, that it should be awarded attorneys' fees and costs "for having to defend this frivolous action." Dkt. 61-2, at 2. Although the ADA allows a "prevailing party" to collect its fees, 42 U.S.C. § 12205, "policy considerations which support the award of fees to a prevailing plaintiff are not present in the case of a prevailing defendant." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418–19 (1978). Accordingly, "fees should be granted to a defendant in a civil rights action only upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Summers v. A. Teichert & Son*, *Inc*., 127 F.3d 1150, 1154 (9th Cir. 1997) (internal quotation marks omitted).

The Ninth Circuit has "repeatedly cautioned that district courts should not 'engage in post hoc reasoning,' awarding fees simply 'because a plaintiff did not ultimately prevail.'" *Kohler v. Bed Bath & Beyond of California, LLC*, 780 F.3d 1260, 1266 (9th Cir.

2015) (quoting *EEOC v. Bruno's Rest.*, 13 F.3d 285, 287 (9th Cir. 1993)). This admonition applies even in cases where, as here, claims are resolved via summary judgment because the court determines that no reasonable jury could return a verdict in plaintiff's favor. *Id.* (quoting *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989)).

Here, as detailed in the factual background section of this decision, Rafferty had reason to suspect KeyPoint impermissibly terminated her because it perceived her to be disabled. She could not determine whether it did so, or instead terminated her for a legitimate reason, until she engaged in extensive discovery with JTS, KeyPoint, and OPM. That such discovery ultimately revealed KeyPoint did not have knowledge of Rafferty's disability and that she was terminated because OPM suspended her access to its contract does not mean Rafferty's claims against KeyPoint were frivolous. The Court accordingly DENIES KeyPoint's request for attorney's fees.

## IV.    CONCLUSION

The Court sympathizes with Rafferty due to the contentious circumstances of her employment with JTS and sudden termination by KeyPoint. Ultimately, however, despite such unfortunate circumstances, Rafferty does not have evidence to support a prima facie case of retaliation or disability discrimination under federal law. In like manner, Rafferty's state law claims fail as well. Accordingly, JTS and KeyPoint are both entitled to summary judgment on each of Rafferty's claims against them.

## V. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. JTS's Motion to Seal (Dkt. 64-6) is **GRANTED** in **PART** and **DENIED** in **PART**;

   a. It is **GRANTED** with respect to Dkts. 65-5; 65-6; 65-9. The aforementioned dockets shall remain under seal;

   b. It is **DENIED** with respect to Dkts. 65; 65-1; 65-2; 65-3; 65-4; 65-7; 65-8; 71, 71-1 and 73. The aforementioned documents will remain under seal for thirty (30) days of the date of this order. If the parties have not submitted a statement identifying specific documents which should be kept sealed for specific reasons within this thirty-day period, the clerk of the Court shall unseal them;

2. Rafferty's Motion to Seal (Dkt. 67) is **GRANTED** in **PART** and **DENIED** in **PART**;

   a. It is **GRANTED** with respect to Dkts. 66; 66-8; 66-14; 66-15; and 66-18. The aforementioned dockets shall remain under seal;

   b. It is **DENIED** with respect to Dkts. 66-1; 66-2; 66-3; 66-4; 66-5; 66-6; 66-7; 66-9; 66-10; 66-11; 66-12; 66-13; 66-16; 66-17; 66-19; 66-20; 66-21; 66-22; 66-23; and 66-24. The aforementioned documents will remain under seal for thirty (30) days of the date of this order. If the parties have not submitted a statement identifying specific documents which should be kept sealed for specific reasons within this thirty-day period, the clerk of the Court shall unseal them;

3. The Court rejects KeyPoint's attempt to file documents under seal, without a requisite Motion to Seal pursuant to District of Idaho Local Civil Rule 5.3. However, the Court will allow Dkts. 62, 62-1, 72, 72-1, 76-1, and 76-2 to remain under seal due to the confidential medical and employment information contained therein.

   a. The other documents KeyPoint filed under seal, Dkts. 72-2, 72-3, 72-4, and 72-5 will remain under seal for thirty (30) days of the date of this order. If, within the thirty days, the parties have not submitted a statement linking such documents to specific reasons why they should be filed under seal, the clerk of the Court shall unseal them;

4. Rafferty's Motion to Strike (Dkt. 68) is **DENIED**;

5. JTS's Motion for Extension of Time (Dkt. 69) is **GRANTED**;

6. KeyPoint's Motion to Strike (Dkt. 72-2) is **GRANTED** in **PART** and **DENIED** in Part. It is **GRANTED** to the extent KeyPoint seeks to strike hearsay statements filed in support of Rafferty's Response to KeyPoint's Motion for Summary Judgment. It is **DENIED** in all other respects;

7. JTS's Motion for Summary Judgment (Dkt.64) is **GRANTED** in its entirety;

///

///

///

///

///

MEMORANDUM DECISION AND ORDER - 68

8. With the exception of KeyPoint's request for attorneys' fees, KeyPoint's Motion

   for Summary Judgment (Dkt. 61) is **GRANTED** in its entirety;

9. The Court will enter separate Judgment in accordance with Fed. R. Civ. P. 58.


DATED: November 30, 2020

David C. Nye
Chief U.S. District Court Judge